Mabel DUNCAN, et al.

v.

The UNITED STATES.

No. 10–75.

United States Court of Claims.

Dec. 2, 1981.

George Forman, Escondido, Cal., attorney of record, for plaintiffs. James F. King, Jr., Willits, Cal., of counsel.

Ezra D. Rosenberg, Washington, D. C., with whom was Asst. Atty. Gen., James W. Moorman, Washington, D. C., for defendant.

Before DAVIS, NICHOLS and KASHIWA, Judges.

ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S MOTION TO DISMISS

DAVIS, Judge:

This is our second consideration of this Indian breach-of-trust case. In the previ-

ous decision (*Duncan v. United States*, 220 Ct.Cl. ——, 597 F.2d 1337 (1979)), we held that the court had cognizance of the claims under 28 U.S.C. § 1491, and that the plaintiffs had a right to recover on much (though not all) of their demands. On the Government's petition for certiorari, the Supreme Court vacated our judgment and remanded the case "for further consideration in light of *United States v. Mitchell*, 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980)." *United States v. Duncan*, 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 255 (1980). On that remand, we received further briefs and had oral argument. We have reconsidered the case, not only in the light of the Supreme Court's *Mitchell* ruling, but also of our recent *en banc* decision in *Mitchell II, Mitchell v. United States*, 664 F.2d 265 (1981) (likewise on remand from the Supreme Court). We adhere to our prior holding, with some modifications.

## I

### Background

Plaintiffs, Pomo Indians of the Robinson Rancheria in Northern California, have attacked the termination by the United States of their rancheria status in 1965. In the companion District Court case against the Secretary of the Interior (and other federal officials), *Duncan v. Andrus*, 517 F.Supp. 1 (N.D.Cal.1977), they obtained declaratory and injunctive relief grounded on that court's determination that the termination was unlawful. No appeal was taken from that decision. In the present suit (initially part of the District Court litigation but transferred here under 28 U.S.C. § 1406(c)), claimants seek monetary recovery for damages resulting from the invalid termination. They have moved for partial summary judgment on liability, mainly urging that the 1965 termination was a breach of trust and rendered the Federal Government responsible for various pecuniary

damages. Defendant has cross-moved to dismiss for lack of jurisdiction and because plaintiffs' claims are allegedly barred by the statute of limitation.

■ The facts on which we base this decision are presented in plaintiffs' uncontested affidavit and in the exhibits accompanying their motion for partial summary judgment. The primary exhibit is a detailed "Agreed Statement of Facts," filed by both sides (plaintiffs and the defendant Government officials) in the District Court case, *Duncan v. Andrus, supra*. This "Agreed Statement" was specifically adopted by the District Court. That court's opinion (which also contains its independent findings) is likewise a source of underlying predicates for our determination; under the principles of collateral estoppel there can be no relitigation of the issues determined in that related proceeding by the same plaintiffs against high federal officials (acting in their official capacity). *See, e.g., Edgar v. United States*, 145 Ct.Cl. 9, 171 F.Supp. 243 (1959); *McGinty v. United States*, 151 Ct.Cl. 399, 403 (1960), *cert. denied*, 368 U.S. 867, 82 S.Ct. 115, 7 L.Ed.2d 63 (1961); Restatement (Second) of Judgments, § 80, Comment e at 22–23, Reporter's Note at 29 (Tent. Draft No. 2, 1975).[1]

Rancherias are numerous small Indian reservations or communities in California, the lands for which were purchased by the Government (with Congressional authorization) for Indian use from time to time in the early years of this century—a program triggered by an inquiry (in 1905–06) into the landless, homeless or penurious state of many California Indians. We are now concerned with the Robinson Rancheria (in Lake County California) which consists of the Rancheria proper and a nearby uninhabited wood reserve, known as the "wood-lot." The Rancheria land was purchased in 1909 under authorization contained in Indian appropriations acts of 1906 and 1908.

---

1. We have no reason to doubt the District Court's jurisdiction to grant affirmative and declaratory relief. Defendant, although characterizing or interpreting the facts in the Agreed Statement and the District Court's opinion somewhat differently from plaintiffs, does not basically contest those facts. In particular, the Government does not offer to prove that the facts were otherwise.

The Rancheria was occupied by a California band of Pomo Indians and the land was informally assigned to families of that band.

After several investigations and much debate, Congress in 1958 passed an act providing for the termination of various rancherias and reservations, including the Robinson Rancheria, Pub.L.No.85–671, 72 Stat. 619 (1958) (the "Rancheria Act"). This law provided for termination of the special status (as Indian lands) of various California rancherias upon approval by a majority of the affected Indians of a final distribution plan. Section 3 of the Act directed the Secretary to undertake various construction projects and improvements on the Indian land before conveying it under the distribution plan. Section 3(c), which founds most of the gravamen of plaintiffs' complaint, required the Secretary to, "install or rehabilitate such irrigation or domestic water systems as he and the Indians affected agree, within a reasonable time, should be completed by the United States." Rancheria Act, 72 Stat. 619, 620 (1958).[2] Under the Act, termination of the Rancheria ended the rights of the Indians to receive special federal services *qua* Indians, and exposed Rancheria lands to state tax liability and regulations. Rancheria Act § 10(b), 72 Stat. 619, 621 *as amended by* Pub.L.No.88–419, § (h), 78 Stat. 390, 391 (1964); *see* Rancheria Act § 2(d), 72 Stat. 619.

Pursuant to the Act, the Secretary of the Interior developed a distribution plan for the Robinson Rancheria which won majority approval in March 1960. The plan provided for distribution of Rancheria lands to 28 named Indians and for the woodlot and certain community property to be conveyed to an association of the Robinson band. Although distribution of Rancheria assets was completed in 1963, final termination

was delayed by negotiations over construction of a sewage system. A final termination notice was published in the *Federal Register* on September 3, 1965. 30 Fed. Reg. 11,330–31 (1965).

Despite serious and well-known water shortages at the Rancheria (the water supply was not sufficient for reasonable domestic needs and was inadequate to irrigate domestic gardens or farm lands), the Secretary made no significant provision for the improvement of Rancheria water supplies prior to termination. The only agreement relating to additional water supplies was a statement in the distribution plan that:

> The Indians of Robinson Rancheria request that the Bureau of Indian Affairs undertake the following actions: * * * (2) Provide water for any residence under construction that is as much as fifty percent completed within a ninety-day period after acceptance of this plan by a majority of the adult Indian distributees, as provided in Section 2(b) of Public Law 85–671.

This statement does not guarantee an adequate year-round water supply, and the record does not indicate how many, if any, of the affected Indians had houses fifty percent complete within the requisite 3-month period.

Similarly, the existing Rancheria sanitation system was grossly inadequate. Most homes lacked any internal plumbing, and there was no water-carried waste system on the Rancheria. After learning of the 1959 statute authorizing the Surgeon General's office to construct water disposal systems on Indian lands, the Robinson band requested a sewage system. *See* Pub.L.No.86–121, § 1, 73 Stat. 267 (codified at 42 U.S.C. § 2004a (1976)). The Public Health Service did install some septic tank and absorption

---

2. Section 3(c) was significantly modified by the 1964 amendments to the Rancheria Act. The amendments expanded the scope of the Secretary's responsibility to include sanitation facilities and delegated responsibility for sanitation facilities to the Department of Health, Education and Welfare. *See* Pub.L.No.88–419, 78 Stat. 390 (1964). Even before the 1964 amendments (which were effective before termination of the Robinson Rancheria) it was clear that the Government had some responsibility to provide Indians with sanitation systems. Under a 1959 statute the Surgeon General was authorized to construct or improve sanitation facilities on Indian lands. Pub.L.No.86–121, § 1, 73 Stat. 267, *amending* Pub.L.No.568, ch. 658, 68 Stat. 674 (1954) (codified at 42 U.S.C. § 2004a (1976)).

field facilities pursuant to a 1964 agreement with the Indians, but some of the absorption fields proved inadequate and no adequate water-carried sewage system was ever provided.

After the initial distribution of Rancheria assets in 1961, Lake County imposed a real property tax on lands held by the Robinson band. This taxation continued until 1977, when the District Court found that the Robinson Rancheria had been unlawfully terminated. *Duncan v. Andrus, supra*, 517 F.Supp. at 6 (N.D.Cal.1977).[3] That court granted various types of nonmonetary injunctive and declaratory relief, including (a) voiding of the termination insofar as it ended the plaintiffs' status as Indians and their eligibility for federal services and benefits provided to Indians by the United States, (b) retention by the plaintiffs (and all dependent members of their families) of their status as Indians under federal law, (c) continued application to the Indians of the Robinson Rancheria of all statutes of the United States which affect Indians because of their status as Indians, and (d) restoration of trust status to the land and assets of the Robinson Rancheria where possible.[4]

## II

### *Bearing of Supreme Court's Mitchell Opinion*

The Supreme Court's *Mitchell* opinion, which we were instructed to consider on remand, does not directly call for or suggest any change in our prior ruling. The holding of *Mitchell* is that, in view of its objectives and legislative history and background, the General Allotment Act, 25 U.S.C. §§ 331–358, did not create any fiduciary responsibility in the United States for management of allotted forest lands. 445

U.S. at 542, 546, 100 S.Ct. at 1354, 1356.[5] The Court expressly left open the issue of whether a statute imposing on the Government general fiduciary duties toward the Indians would constitute a waiver of sovereign immunity. 445 U.S. at 542, 100 S.Ct. at 1354. Here we have that very case. The plaintiffs have always urged (and we previously held) that Congress has created, in legislation other than the General Allotment Act, a general trust relationship toward them as Indians which enables them to sue in this court on money claims for breach of trust. *Mitchell* leaves them free to make that contention, and we are free to decide it.

*Mitchell* did, however, give overall guidance as to the interpretation and application of statutes said to waive federal immunity from suit. In *Mitchell II, supra*, we have taken account of, and tried to follow, that direction. *See* slip opinion, especially Parts II and III. In our reconsideration of the present case, we have applied the principles of *Mitchell II* as they are relevant here, in that way utilizing the general teachings of the Supreme Court's decision in *Mitchell*. The pith of it is that the Supreme Court's *Mitchell* decision, which dealt with a quite different statute and set of facts, bears only indirectly on the present case, and to the extent that it has an impact we believe we have properly taken it into account in our *Mitchell II* ruling and in this opinion.

## III

### *Jurisdiction over Indian Breaches of Trust*

*Mitchell II* rules that, if a statute creates or recognizes the United States as general trustee of Indian property, that legislation

---

**3.** The District Court placed its decision primarily on the Government's failures with respect to the water and sanitation facilities. The judge also pointed out that "[t]he Indians of the Robinson Rancheria were not represented by counsel in negotiating and approving the termination agreement" and suggested that the Government's procedure in dealing with those Indians with respect to the water systems was not fully fair.

**4.** Bona fide purchasers (for value) from the Indians were not to be affected. *See* note 6, *infra*.

**5.** The trust was held limited in purpose "to prevent alienation of the land and to ensure that allottees would be immune from state taxation." *See* 445 U.S. at 542, 542–44, 100 S.Ct. at 1354, 1354–55.

ordinarily founds a substantive monetary claim for breach of that trust, a claim which may be vindicated by the Indian beneficiaries through a suit for breach of that trust which may be brought in the Court of Claims under 28 U.S.C. § 1491 (and 28 U.S.C. § 1525). That *en banc* holding is, of course, binding on this panel. If, therefore, such a trust exists over plaintiffs' land and assets—covering claimants' current assertions of breach—this court has jurisdiction to entertain the suit. The remaining issues are: Did such a trust relationship, embracing the subject of the alleged breaches, exist between the United States and the Robinson Rancheria Indians? If so, was that trust breached? If breached, what type of damages can plaintiffs properly claim in this court? Finally, are plaintiffs' claims barred by limitations?

IV

*The Trust Relationship Here—Nature and Consequences*

A. In *Duncan v. Andrus, supra,* the District Court found that until the purported termination legal title to the land of the Robinson Rancheria remained in the United States, "although it was acknowledged that the United States held in trust for the California Indians."[6] Not only are we bound by that ruling under the doctrine of issue preclusion, but we agree with it and come to the same conclusion on our own. We do so on the basis of the context and language of the original appropriations acts authorizing purchase of the Robinson tract; the contemporaneous and continuing interpretation by the agency charged with supervision of the rancherias; and the wording of the 1958 Rancheria Act demonstrating a subsequent Congress's acknowledgment of the trust relationship.

The original appropriations acts which authorized purchase of the Robinson (and other) rancheria lands were passed in response to the Kelsey Report. At the request of the Indian Office Mr. Kelsey had surveyed the situation of California Indians and recommended that Congress appropriate monies to provide reservations for homeless Indians, and adequate water-supplied allotments for Indians holding desert allotments. *See Duncan v. Andrus,* 517 F.Supp. at 2 (N.D.Cal.1977). In 1906, Congress accepted the basic recommendation, authorizing expenditures to purchase land "for the use of the Indians in California." Act of June 21, 1906, Pub.L.No.258, ch. 3504, 34 Stat. 325, 333 (1906). The 1906 authorization was renewed in substantially the same terms in 1908, and, in 1909, the Robinson land was purchased for that purpose. *See* Act of April 30, 1908, Pub.L.No. 104, ch. 153, 35 Stat. 70, 76–77 (1908).

While not expressly stating that the United States held the land as trustee, Congress clearly contemplated that this land have the same general status as reservation lands. In addition to purchasing lands, the 1906 Act authorized the Secretary of the Interior to "fence, survey and mark the boundaries of such Indian Reservations." *See generally* United States Department of the Interior, Federal Indian Law 609 (rev. ed. 1958) (not necessary that Congress use the word "reservation" to create Indian reservation lands); *United States v. McGowan,* 302 U.S. 535, 538–39, 58 S.Ct. 286, 288–89, 82 L.Ed. 410 (1938). Congress also intended that the Interior Department supervise this Indian property; Interior did so continuously until the termination at issue.[7] In *Mitchell II (see* at 40–41) we adopted and applied our panel holding in *Navajo Tribe of Indians v. United States,* 224 Ct.Cl. ——, ——,

---

**6.** The court's decree held the Secretary of the Interior and his subordinates "under a continuing duty to restore trust status to the lands and assets of the Robinson Rancheria where possible." Some of the lands had been sold in good faith to non-Indians during the period of the unlawful termination (1965–1977) and restoration of trust status was not required as to such lands.

**7.** *See* Agreed Statement of Facts, p. 13:
"From the time of the creation of the Robinson Rancheria in 1906 until publication of a termination notice for the Rancheria in 1965, the Secretary of the Interior recognized a federal trust relationship with the Robinson or East Lake Band, as a distinct Indian tribe or band of Indians."

624 F.2d 981, 987 (1980) that, where the Federal Government takes over control or supervision of Indian property, the fiduciary relationship normally exists (unless Congress has provided otherwise) even though nothing is said expressly in the statute about a trust or fiduciary connection. That ruling squarely applies here as well.

This interpretation of the appropriations statutes is reinforced by the Interior Department's long-standing position that the United States had a trust duty to the Robinson band. The Agreed Statement of Facts at pages 12–13 states:

> While the deed to the United States from Jesse Bryant Robinson and his wife did not mention the fact that the Rancheria was to be occupied by Indians and did not expressly create a trust, it was always understood by the Interior Department—after the purchase of the Rancheria—that it was being held by the United States for the use of the East Lake or Robinson Pomo Indians.[8]

*See also* note 7, *supra*. It is a "venerable principle" that an agency's long-standing interpretation of a statute it is charged with implementing is entitled to great weight. *See, e.g., Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969); *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 121, 93 S.Ct. 2080, 2095, 36 L.Ed.2d 772 (1973) (quoting *Red Lion*); *Vogt v. United States*, 210 Ct.Cl. 246, 252–53, 537 F.2d 405, 409 (1976); *Sode v. United States*, 209 Ct.Cl. 180, 187, 531 F.2d 531, 535 (1976).

This principle is particularly compelling when the agency interpretation is reinforced by subsequent congressional legislation (here the 1958 Rancheria Act). *E.g., NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381–82, 89 S.Ct. 1794, 1801–02, 23 L.Ed.2d 371 (1969). The Rancheria Act clearly states the understanding of the 1958 Congress that Rancheria lands had been and would continue to be held in trust until final termination. For example, section 9 of the Act allows the Secretary to provide the Indians with special education and training programs "[p]rior to the termination of the Federal trust relationship in accord with the provisions of this Act * * *" Pub.L.No.85–671, § 9, 72 Stat. 619, 621 (1958); *see id.* at § 3(e), 72 Stat. 619, 620.[9] Another accepted canon states that subsequent legislation declaring the meaning of an earlier statute is entitled to great weight where the earlier legislation permits that interpretation. *See, e.g., Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 380–81 & n.8, 89 S.Ct. 1794, 1801 & n.8, 23 L.Ed.2d 371 (1969); *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974).

On the bases of the original authorization acts, reinforced by a long-standing agency interpretation and subsequently confirming congressional legislation, we find (as did the District Court in *Duncan v. Andrus, supra*) that the United States did have a trust relationship with the Indians on the Robinson Rancheria. *Cf. Smith v. United States*, 515 F.Supp. 56 (N.D.Cal. 1978) (finding trust relationship with Hopland Rancheria).

B. Unlike the limited trust created in the General Allotment Act (*see Mitchell, supra*, 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607), the Congressional trust for the Robinson Rancheria was general and unlimited. Nothing in the wording of the statutes, the course of administration, or the legislative history suggests that the trust had a restricted purpose, or failed to cover the general oversight of the Rancheria land and property for the benefit of the Indians. Defendant urges that a federal trust must spell out specifically all the trust duties of the Government as trustee. That

---

8. There is no evidence contradicting the view that the responsible agency, the Interior Department, has always believed the United States was trustee of lands for the Robinson band.

9. Section 3(e) refers to land exchanges "before the termination of the Federal trust."

is certainly unnecessary for Indian property with its long and established history (as we pointed out in *Mitchell II*) of governmental fiduciary obligation in the case of management of Indian property. A broad-scale Congressional establishment of a trust is enough.[10] Moreover, the Rancheria Act did recite a number of specific obligations of the Secretary of Interior, including responsibilities which plaintiffs say were clearly left unfulfilled. *See* note 13, *infra.* Chief among these was the directive in § 3(c) (as amended) to construct and improve (before termination) the sanitation and water facilities upon which the Department should agree with the Indians.[11] It is also important, as we stress *infra* (Part IV, C), that the Rancheria Act was designed so that, before termination, the Indian properties were to be raised to such status that the Indians could properly manage on their own after the termination of the trust. More than that, Congress indubitably directed that the Indians should receive the lands, assets, and monies to which they were legally entitled. These are all specific duties expressed and inherent in the Rancheria Act. *See* Part IV, C, *infra.*

■ C. This legislative creation of a general trust relationship as to the property of the Robinson Rancheria grounds compensation for breach of that trust. Neither the particular statutes nor the history of Interior's supervision signifies any other result.

*Mitchell II* holds that, in similar circumstances, Congress has consented to suit in this court for proper compensation. _ *See Mitchell II*, at 271–273.[12] As in that case, we have Congressional legislation dealing with Indian property which was to be managed and controlled by federal officials as fiduciaries in the interest of and for the benefit of the Indians, and from which Congress desired the Indians/to obtain the proper economic and financial benefits. The objective to help and benefit these Indians is undeniable. The land was bought "for the use of the Indians in California," and it was always held for that purpose (these Pomo Indians being part of the California Indians). *See* Parts I and IV, A, B, *supra.* And, as the District Court said in *Duncan v. Andrus, supra,* in the 1958 Rancheria Act "Congress is attempting to end its traditional trust relationship with a group of Indians and to place them on the road to economic self-sufficiency. It was the manifest intent of Congress in enacting the Rancheria Act to grant to Indian distributees economic resources in fee simple that would enable them to sustain themselves as productive and useful citizens, independent of collateral federal programs and benefits." Memo. op. at 9 (N.D.Cal. March 22, 1977).[13] By the same token, it is inherent in the language and scheme of the Rancheria Act that the Indians were to obtain from

---

**10.** It is difficult to see why Congress should have to do more to create an Indian trust than a private settlor would have to do to establish a private trust.

**11.** In *Duncan v. Andrus, supra,* the District Court interpreted this requirement (in the light of the overall aim of the Rancheria Act) as calling upon the Secretary to provide for the Indians, before termination, water and sanitation facilities which would be adequate for them after termination. *See* the District Court memorandum, pp. 5–10. We agree with that reading of the Act.

**12.** *See also Whiskers v. United States,* 600 F.2d 1332, 1335, 1337 (10th Cir. 1979). The decision in that case against the Indians turned on the court's conclusion that the specific statute there involved (wholly different from the statutes with which we are concerned) did not create any trust relationship.

**13.** The purposes of the Rancheria Act, revealed by its terms, were (i) to distribute equitably the assets and lands of the Rancheria (§§ 1, 2, 5), (ii) to raise the Rancheria's roads and water systems, without cost to the Indians, to adequate levels before termination (§ 3, as amended), (iii) to give the Rancheria owners the financial benefits of vacant or unoccupied land sold by the Secretary (§ 5), (iv) to train the Indians for the termination of trust and of Indian status (§ 9), and (v) to distribute to the Indians their funds on deposit (§ 6).

The Secretary's regulations, specifically authorized by the Rancheria Act (§ 12), declare that the property to be distributed to the individual Indians constitutes "vested property which may be inherited or bequeathed but shall not otherwise be subject to alienation or encumbrance before the transfer of title to such property." 25 C.F.R. § 242.7 (1959).

the Government land, assets, and funds—not merely intangible or non-material help and encouragement.

Contrary to defendant's argument, this is not a case in which the court, on its own, imposes a trust relationship without clear direction from Congress. Instead, Congress created and maintained a trust involving Indian property—and then provided for its termination, while making clear that trust status was to continue until termination—without ever indicating, by word or by intimation, that the trustee's normal duty of monetary liability for breach of trust was to be abrogated.[14] Prospective injunctive or declaratory relief would not give redress for the types of serious past injury suffered here through breach of trust—as discussed in Parts I, V, and VI, of this opinion. *See Mitchell II, supra,* at 272, 273–274. (In this instance, the plaintiffs bore the consequences of an invalid termination for some twelve years (1965–1977), and in some cases longer, before the termination was judicially held to have been illegal and a breach of trust.) There is no doubt at all that if, after the distribution plan was accepted, the Secretary (before implementing the plan) had improperly wasted some Indians' property or illegally transferred it to a complete outsider, the affected Indians could sue in this court under 28 U.S.C. § 1491, for the value of those assets under the theory of breach of the statutory trust which had been implemented by the Rancheria Act. We see no adequate reason why a like suit cannot be brought here when (as we show

in Part V, *infra*) the Secretary breached the trust by illegally terminating that trust—contrary to the Act—causing comparable detriment to the Indians.

We conclude, therefore, that in the legislation involving the Robinson Rancheria Congress clearly authorized and mandated compensation for federal breaches of trust—and this court is the proper forum (in this case, under 28 U.S.C. § 1491). The substantive claim for monetary compensation was created by the rancheria legislation (including the Rancheria Act) which formed (and continued) a general trust and laid down specific duties—and the right to sue the Government in this court was completed by the Tucker Act, 28 U.S.C. § 1491. *See United States v. Mason,* 412 U.S. 391, 394, 398, 93 S.Ct. 2202, 2205, 2207, 37 L.Ed.2d 22 (1973).[15]

## V

### *Breach of Trust*

■  Defendant concedes that termination of the Robinson Rancheria was unauthorized because Interior did not provide required water and sanitation systems. As we have emphasized, the District Court for the Northern District of California has independently found that the termination was unauthorized. *Duncan v. Andrus,* 517 F.Supp. at 4–6 (N.D.Cal.1977). However, defendant has argued to us that, although unauthorized, the premature termination was not a breach of trust. Defendant's theory is that the Government had consider-

14. The unappealed District Court judgment, *Duncan v. Andrus, supra,* shows in itself the existence of the substantive right to be vindicated, at the least by affirmative and declaratory relief.

Section 10(a) of the Rancheria Act provided that "the distribution of assets pursuant to such [Secretarially approved] plan shall not be the basis of any claim against the United States by an Indian who received or is denied a part of the asset distributed," but this bar to claims affected only those Indians who were not satisfied with the manner in which the Rancheria's assets were to be divided among the Rancheria Indians in the distribution plan. There is no statement or suggestion barring claims for the breaches of trust by the Secretary asserted

here, which had nothing to do with the division of the assets among the Indians.

15. This case is quite different from our holding that 28 U.S.C. § 1505 (the analogue of the Tucker Act for Indian tribes) does not grant us jurisdiction over claims that Congress itself, in a different termination Act, violated a pre-existing trust (without trenching on the Constitution). Here, federal officials, not Congress, are charged with unauthorized violations of a trust established and maintained by Congress itself. There is no claim that the Rancheria Act was a violation of trust. See our discussion in *Menominee Tribe of Indians v. United States,* 221 Ct.Cl. ——, ——, 607 F.2d 1335, 1340, 1343–44 (1979), *cert. denied,* 445 U.S. 950, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980).

able discretion under the 1958 and 1964 statutes, that Interior did provide some water and sewage facilities, and therefore its actions were reasonable, and not a breach of trust.[16]  On this record, that theory must fail.

First, *Duncan v. Andrus* has already determined that there was a breach of trust. That court held that in negotiating with the Rancheria Indians the Secretary of the Interior "must come to the bargaining table as a fiduciary or trustee of the Indians," but that "the Secretary has fallen far short of his obligations in this case.  * * * The Secretary has ensured neither fairness of procedure nor fairness of result in the Robinson Rancheria water system * * *." We know of no adequate reason why these prior determinations in a suit between the same litigants should fail to be binding on defendant and on us.  *See Montana v. United States*, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

Second, even if we are to canvass the issue anew, we come to the same result. Although the Secretary has discretion as to the amount and kind of water and sanitation systems, this does not allow him to terminate before ensuring a water supply sufficient to meet reasonable domestic needs.  Section 3(c) of the Rancheria Act demonstrates a Congressional purpose to provide the Indians with sufficient water systems to become self-sufficient by the time of termination.  *See* the discussion in *Duncan v. Andrus*, 517 F.Supp. at 1 (N.D. Cal.1977), and text at note 11, and note 11, *supra*, as well as our discussion *infra*.  The uncontested facts show that the Secretary fell considerably short of providing suffi-

cient water supplies to the Robinson Rancheria.  *See* Part I, *supra*.

Moreover, the standard of duty for the United States as trustee for Indians is not mere "reasonableness," but the highest of fiduciary standards.  *See, e.g., United States v. Mason*, 412 U.S. 391, 398, 93 S.Ct. 2202, 2207, 37 L.Ed.2d 22 (1973); *Coast Indian Community v. United States*, 213 Ct.Cl. 129, 153, 550 F.2d 639, 652–53 (1977); *Cheyenne-Arapaho Tribes v. United States*, 206 Ct.Cl. 340, 345, 512 F.2d 1390, 1392 (1975); *Manchester Band of Pomo Indians, Inc. v. United States*, 363 F.Supp. 1238, 1243 (N.D.Cal.1973).  Under these fiduciary standards the Secretary breached his trust obligations.  Procedurally, Interior failed to disclose adequately to the Indians their statutory rights to water-carried sewage systems or the limits on congressional funds provided for pretermination services.[17]  Substantively, the distribution plan's agreement on water supplies was so vague and uncertain, and so unlikely to fulfill the Congressional objective, as to breach the trustee's duty of fair dealing.  *See* the discussion in *Duncan v. Andrus, supra; cf. Smith v. United States*, 515 F.Supp. 56 (N.D.Cal. 1978) (United States breached its trust duty to Hopland Rancheria Indians by failing to provide adequate water supplies).  In the words of *Duncan v. Andrus*, it was of "critical importance" to carry out the legislative aim, which was to grant the Indians self-sufficiency, that their lands be "livable and agriculturally viable," of which "water is an indispensable incident."  There is no doubt, on the presentation to us, that a serious breach of trust occurred under the standards set forth in *Mitchell II*, Part III, D (at 273–274).[18]

---

16.  This contention does not seem to have been repeated in the presentation on remand.

17.  Plaintiffs say, not unreasonably, that this failure was significant because these Rancheria Indians could not be compelled to agree to a termination plan and would not have agreed if the true circumstances had been revealed to them.

18.  Ours is not a complete catalogue of the breaches which may have been committed, but

examples of the types of breaches caused by the concededly unauthorized termination.  On remand, plaintiffs are free to prove other breaches (if they can) in connection with their damage claims (*see* Part VI, *infra*); the standards of *Mitchell II*, Part III, D, are of course applicable.

By citing a breach of trust denominated as a duty of fair dealing we are not invoking the "fair and honorable dealing" jurisdiction of the former Indian Claims Commission.  Rather, we

## VI

### Damages

Plaintiffs originally presented a wide variety of damage demands outlined in three separate claims. The first, based on the Government's failure to supply adequate water and on the termination itself, seeks recovery of $100,000 for each plaintiff for a number of resulting injuries including losses caused by subjection to real property taxes, deprivation of various federal services to Indians, partial destruction of the Pomo culture, and emotional distress and bodily injuries.[19] The second claim, predicated on the Government's failure to provide adequate sanitation facilities, requests $10,000 for each plaintiff based on the following three injuries:

a) They have been deprived of operable sanitation and waste-disposal facilities for over ten years, have been forced to resort to outdoor privies, and have gone without indoor privies, and have gone without indoor bathing facilities;

b) They have been deprived of indoor plumbing and the opportunity to raise their families in a decent, safe, and sanitary condition;

c) They will, in the future, be deprived of such sanitation facilities.

The third claim seeks recovery for Interior's failure to reserve a right-of-way easement to the community woodlot. Damages in the amount of $5,000 for each plaintiff are sought for these deprivations:

a) They have been deprived of access to their woodlot for over ten years;

b) They have been deprived of marketable title to their woodlot for over ten years;

c) Their woodlot has been decreased in value and they will be deprived in the future of access to it.

While some of plaintiffs' damage claims clearly fall within the types of monetary damages previously considered by this and other courts, other demands are premised on unusual theories (compensation for injury to native culture or for psychological injuries). A survey of recent Indian cases in this court alleging a Government breach of trust reveals that monetary damages have been limited to tangible direct injuries to property or to direct losses due to denials of required services. In *Klamath & Modoc Tribes v. United States*, 174 Ct.Cl. 483 (1966), the Indians sought recovery for reservation property sold by the Government at an allegedly inadequate price.[20] In *Navajo Tribe v. United States*, 176 Ct.Cl. 502, 364 F.2d 320 (1966), the court awarded damages on one claim for a Government breach of trust in failure to notify the Indians of an assignment of their lease; damages were calculated based on the then present value of the lease. In *Capoeman v. United States*, 194 Ct.Cl. 664, 440 F.2d 1002 (1971), the plaintiffs' breach of trust claims were

---

illustrate a breach of duty under a statutory trust mandating compensation by the Government.

**19.** Plaintiffs' petition lists the damages under the first claim as follows:

(a) The integrity of their Rancheria has been destroyed, and much of the Rancheria's lands have falled [sic] into non-Indian ownership;

(b) They, and other Indians of Robinson Rancheria, have been subjected to land taxation;

(c) Their native Pomo culture has been partially destroyed and is now grievously threatened with complete extinction;

(d) They, and other Indians of the Rancheria, have been subjected to regulation by California of home building activities on the Rancheria which are inconsistent with an Indian way of life;

(e) They have been forced to live without adequate water or sanitation facilities for more than ten years;

(f) They have suffered, as a result, grevous [sic] emotional distress and bodily injuries;

(g) They, and their dependents, have been deprived of eligibility for a wide variety of federal services and benefits provided to Indians by the United States because of their status as Indians.

**20.** Because the case was presented to the court on defendant's motion to dismiss for lack of jurisdiction, the court did not analyze what damages were recoverable. In a subsequent consideration of the same claims, the court found liability as to certain lands only on a Fifth Amendment taking theory. *Klamath & Modoc Tribes v. United States*, 193 Ct.Cl. 670, 436 F.2d 1008, *cert. denied*, 404 U.S. 950, 92 S.Ct. 271, 30 L.Ed.2d 267 (1971).

grounded on allegedly unjustifiable Government costs assessed from sales of timber from Indian property. The same damage claims were also raised in *Quinault Allottee Ass'n v. United States*, 202 Ct.Cl. 625, 485 F.2d 1391 (1973), *cert. denied*, 416 U.S. 961, 94 S.Ct. 1980, 40 L.Ed.2d 312 (1974). Plaintiffs had an even more tangible damage claim in *Cheyenne-Arapaho Tribes v. United States*, 206 Ct.Cl. 340, 512 F.2d 1390 (1975), alleging the Government as trustee mismanaged specific funds held for the Indians. In another case which awarded damages on a breach of trust claim, *Coast Indian Community v. United States*, 213 Ct.Cl. 129, 550 F.2d 639 (1977), the court compensated plaintiffs for a sale by the Government of an Indian right-of-way at a grossly inadequate price. The calculation of damages was based on the difference between the fair value of the right-of-way and the actual sale price. Most recently, in *Mitchell II, supra*, this court remanded for further proceedings breach of trust claims based on a failure to properly manage Indian forest lands or to invest Indian funds.

Similarly, a review of the Supreme Court's decision in *United States v. Mason*, 412 U.S. 391, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973), and lower federal court cases cited to us reveals no case in which any court considered damage claims as nebulous and remote as some urged here.[21]

■ This lack of precedent for recovery of monetary damages for consequential personal suffering or injury to the native culture reflects the difficulties which compel rejection of such claims. The doctrine of sovereign immunity, as applied to pecuniary claims in this court, requires the court to find that a statute can be interpreted as "mandating compensation by the Federal Government for the damage sustained." *Eastport S. S. Corp. v. United States*, 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967) *quoted with approval, United States v. Testan*, 424 U.S. 392, 400, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976). We have found here, as in *Mitchell II, supra*, that this statutorily-created trust relationship does mandate certain types of compensation for a breach. However, it does not follow that the congressional scheme mandates compensation for every conceivable form of damages. As discussed *supra*, this and other courts have thus far found congressional allowance for basically two types of standard trust claims—losses due to mismanagement of trust funds, *see Capoeman v. United States*, 194 Ct.Cl. 664, 440 F.2d 1002 (1971); *Quinault Allottee Ass'n v. United States*, 202 Ct.Cl. 625, 485 F.2d 1391 (1973), *cert. denied*, 416 U.S. 961, 94 S.Ct. 1980, 40 L.Ed.2d 312 (1974); *Cheyenne-Arapaho Tribes v. United States*, 206 Ct.Cl. 340, 512 F.2d 1390 (1975), or losses due to mismanagement of tangible trust properties, *see Klamath & Modoc Tribes v. United States*, 174 Ct.Cl. 483 (1966); *Navajo Tribe v. United States*, 176 Ct.Cl. 502, 364 F.2d 320 (1966); *Coast Indian Community v. United States*, 213 Ct.Cl. 129, 550 F.2d 639 (1977); *Mitchell II, supra*. Direct monetary damage due to improper subjection to state or local taxes, as a result of a federal breach of trust, would also seem to fall squarely within the same category. *See Smith v. United States*, 515 F.Supp. 56 (N.D.Cal.1978); *cf. United States v. Mason*, 412 U.S. 391, 398, 93 S.Ct. 2202, 2207, 37 L.Ed.2d 22 (1973). These are all injuries proximately caused by the breaches of trust shown here—the most significant of which was the improper termination by the Secretary—and, accordingly,

---

**21.** In *Mason*, although the claims were rejected on the merits, plaintiffs claimed direct damages from allegedly invalid state tax assessments on their land. *See also Santa Rosa Band of Indians v. Kings County*, 532 F.2d 655 (9th Cir. 1975), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 731, 50 L.Ed.2d 748 (1977) (claims based on county zoning regulation of Indian lands; only declaratory and injunctive relief sought); *Manchester Band of Pomo Indians, Inc. v. United States*, 363 F.Supp. 1238 (N.D.Cal.1973) (damages aris-

ing from federal mismanagement of Indian trust funds); *Pyramid Lake Paiute Tribe v. Morton*, 354 F.Supp. 252 (D.D.C.1972) (claims based on Secretary's misallocation of tribal water rights; declaratory relief granted); *Smith v. United States*, Nos. C–74–1016 WTS & C–74–1061 WTS (N.D.Cal. March 29, 1978) (damages granted for state taxation of rancheria trust lands which were prematurely terminated).

are included within the range of proper recovery.

There is a problem as to recovery of the value of benefits (*e.g.* health, education, and sanitary benefits) improperly withheld after the unlawful termination. Our present difficulty is that we do not now know (the point has not yet been adequately presented) the statutory or regulatory source of these benefits, and whether the Indians could sue for them *in this court* if, wholly apart from termination, the Secretary had arbitrarily or unlawfully decided to withhold them. If the Indians could not sue here if there had been such an arbitrary or illegal refusal to grant these benefits, the unlawful termination (and the trust breach) would not grant claimants a right to recover in this court which they would not otherwise have. There would then be no basis in statute or regulation for damages to be awarded by us. On the other hand, if they could sue here for such an arbitrary or unlawful withholding, the invalid termination would seem to be the equivalent of an otherwise arbitrary or unlawful refusal, and damages could be allowed.[22] The matter must be left to the trial judge for further development.

■ As we have indicated, at least two of plaintiffs' bases for claimed damage—injury to Pomo culture and consequential emotional and psychological injuries—go far beyond the types of damage normally awarded, and we cannot find any express or implied Congressional authorization for such a recovery. These demands are very close kin to charges of destruction of Indian peoplehood which even the broad rubrics of the Indian Claims Commission Act did not cover. *See Gila River Pima-Maricopa Indian*

*Community v. United States* (Davis, J., concurring), 190 Ct.Cl. 790, 801, 427 F.2d 1194, 1200, *cert. denied*, 400 U.S. 819, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970). Moreover, such alleged cultural or psychological injuries fall wholly outside of the purview or objectives of the statutory standards which Congress has often established for management of Indian funds or property. *See, e.g., Mitchell II supra; Manchester Band of Pomo Indians, Inc. v. United States*, 363 F.Supp. 1238, 1243 (N.D.Cal.1973) ("Congress has also been vigilant in setting forth the standards by which Government-managed Indian trust funds must be invested.") Nor do such cultural or emotional losses fall into the category of damages where standards of duty and measures of recovery are provided by traditional trust law doctrines. *Cf. Coast Indian Community v. United States*, 213 Ct.Cl. 129, 550 F.2d 639 (1977) (sale of trust property at unfairly low price; damages based on difference between fair market value of trust land and actual sales price); *Navajo Tribe v. United States*, 176 Ct.Cl. 502, 364 F.2d 320 (1966) (assignment of lease without notice to beneficiary; damages based on market value of lease). In the absence of some indication of Congressional authorization and without statutory or common law standards of trustee duty and of compensation, we cannot discover any mandate for allowance of these two alleged consequential losses.[23] *See Mitchell II supra,* at 44–45.

■ Other of the damage claims we leave open without decision until facts are more fully developed so as to reveal more precisely the circumstances of the asserted injury and the connection, direct or other-

---

**22.** In that event, it was an arbitrary or illegal refusal to withhold these services and benefits solely on the ground of a termination that was not a lawful one.

**23.** The practical difficulties of assessing causation and an appropriate quantum of damages for such cultural and emotional injuries said to arise from a breach of trust are also considerable, not to speak of how to determine what was Pomo culture before the breach and what impact the breach had on the then-existing Indian society. The Supreme Court has recently im-

plied, in a case involving judicial inquiry into tribal membership standards, that the federal judiciary might well be wary of entering into such uncharted fields: "Given the often vast gulf between tribal traditions and those with which federal courts are more intimately familiar, the judiciary should not rush to create causes of action that would intrude on these delicate matters." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72 n.32, 98 S.Ct. 1670, 1684 n.32, 56 L.Ed.2d 106 (1978).

wise, between that loss and the Government's breach. In this group are the sale by Robinson Indians of much of the Rancheria's lands to non-Indian owners,[24] and the subjection of the Robinson Indians to regulation by California of home-building activities. For the latter, if plaintiffs can demonstrate that the Government's unlawful termination exposed them to state regulations which directly and proximately increased the pecuniary costs of building or maintaining homes on the Rancheria, then recovery should be allowed (but damages should not be awarded because state regulation was "inconsistent with an Indian way of life"). As for alleged physical injuries to plaintiffs or their families due to the breach, we also leave the question of compensability wholly open for future development and decision.

■ To sum up on damages, on remand to the Trial Division for determination of the extent and amount of Government liability, the trial judge should award: (a) damages directly due to the trustee's proven mismanagement (through misfeasance or nonfeasance) of land or physical property (*e.g.*, alleged failure to provide a right-of-way to the community woodlot, if that was a breach of trust), or of funds, and (b) damages directly due to the loss of tax immunities during the invalid termination. Claims for injury to Indian culture (or for happenings inconsistent with the "Indian way of life") or for personal or family psychological distress are not recoverable. The other damage claims are left open for later decision in accordance with this opinion (depending in large part on the showing to be made). The test should always be that of proximate causation by a proven breach of trust.

### VII

### *Statute of Limitations*

■ Defendant also contends that, even if this court has jurisdiction over the breach of trust claims, the action is barred by the six-year statute of limitations, 28 U.S.C. § 2501 (1976). The Government's point is that the invalid termination was announced on September 6, 1965, and plaintiffs' petition in this court bears the date of February 5, 1975, obviously more than six years later. The easiest reply is that plaintiffs had validly filed a claim for damages in the United States District Court (as part of *Duncan v. Andrus, supra*) on August 19, 1971, within the six-year period. After amending the complaint to increase damages above the District Court's $10,000 jurisdictional limit, plaintiffs were granted a transfer to this court under 28 U.S.C. § 1406(c) (1976). The transfer order was received here on January 17, 1975, and plaintiffs simply refiled their claim on February 5, 1975, to conform with the rules of this court. *See* Ct.Cl.R. 181.

The transfer statute clearly mandates that upon transfer the case shall proceed " * * * as if it had been filed in the Court of Claims on the date it was filed in the district court." 28 U.S.C. § 1406(c) (1976). This statute has been liberally construed to lift an otherwise existing statute of limitations bar, and this construction is amply supported in the legislative history. *E.g. Rothman v. United States*, No. 363–77 (Ct.Cl. order Jan. 26, 1979), 219 Ct.Cl. ——; *see* S.Rep.No.1894, 86th Cong., 2d Sess. 4 (1960) *reprinted in* [1960] U.S.Code Cong. & Ad.News 3583, 3585. It is clear, therefore, that plaintiffs' claims are not barred.

Plaintiffs' motion for partial summary judgment on the issue of liability is granted. Defendant's motion to dismiss for lack of jurisdiction or for failure to meet the statute of limitations is denied. The case is remanded under Rule 131(c) to the Trial Division for determination of the nature and extent of damages in conformity with this opinion.[25]

---

24. This undecided category does not include the loss of land through tax sales—damages which we consider to be a recoverable and direct consequence of improper imposition of state or local taxes.

25. Plaintiffs also premise liability on a breach of contract theory, arguing that the termination agreement itself constituted a contract which the United States breached. In view of our disposition, we do not reach this alternative

NICHOLS, Judge, concurring:

I concur because I cannot urge the panel not to follow the recent *en banc* decision *Mitchell v. United States*, Ct.Cl., 664 F.2d 265 (1981). I dissented therein and of course nothing said by the court here eases my difficulties. The law of this court now is, however, if a statute creates or recognizes the United States as general trustee of Indian property, that legislation founds a substantive money claim for breach of that trust which the Indian beneficiary may vindicate by a suit for breach of trust in this court under 28 U.S.C. § 1491, and 28 U.S.C. § 1505, if applicable; this notwithstanding that no statutory language expressly or impliedly states that the United States will make good any adverse consequences of the errors or malfeasance of its officers in the premises, despite that the United States is not subject to suit unless it consents to be sued, and despite the rules as to how to identify such consent, spelled out by precept and example in cases such as *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). There is no use debating the matter again at this level. We await reactions elsewhere, and if there are none, or none adverse, I shall be happy to be proven wrong. This righting of injustice is a thing I would wish us to be doing more of, and these claimants have an appealing case.

It is important, however, to note that a trust is a trust, and a suit on a trust theory must claim a breach of the trustee's peculiar duties. For a trust to exist there must be identifiable a trustee, a *res* and a beneficiary. A trustee can be guilty of actionable misconduct on a trust theory only with respect to the *res* in his possession and control, and he owes no duty to the beneficiary *dehors* the *res*. A trustee is not *qua* trustee a social worker, a guardian, a pedagogue, or a physician. Any of these might be under a legal duty, *e.g.*, to warn a relief client, a ward, a student, or a patient, of the evils of drink, but a trustee would not, nor would he

be liable if the unwarned beneficiary (not his relief client, ward, student, or patient) became an alcoholic (always assuming the trust *res* was not a cellar of fine old booze, which the beneficiary consumed at an excessive rate). In the instant suit, as in many others, the petition reveals a state of complete confusion as to the capacity in which the United States misconducted itself and the source of the duties for breach of which it is to be held liable. This confusion to some extent carried over into our first *Duncan* opinion. The court's opinion now embodies a commendable effort to straighten the matter out, but I do not labor under the delusion it will not be necessary to address it again.

Why the United States should be liable as trustee and not as case worker, guardian, pedagogue, or physician, is a question that, no doubt, is neither here nor there at present. Once the trustee's liability is firmly established, or reestablished, our systematizers can go to work on the other problems.

contention. Likewise, we do not reach at this time plaintiffs' claim of a Fifth Amendment taking; plaintiffs have leave to preserve and

renew that contention after the full facts are determined in the Trial Division.