Mabel DUNCAN, et al., Plaintiffs,

v.

Cecil D. ANDRUS, et al., Defendants.

Nos. C–71–1572–WWS, C–71–1713–WWS.

United States District Court,
N. D. California.

March 22, 1977.

George Forman, California Indian Legal Services, Oakland, Cal., for plaintiffs.

David E. Golay, Asst. U. S. Atty., San Francisco, Cal., for defendants.

## INTRODUCTION

SCHWARZER, District Judge.

Plaintiffs, who are current and former Indian residents of the Robinson Rancheria in Lake County, California, have brought these actions against the Secretary of the Interior, other named federal officers, and the Lake County Tax Collector. Plaintiffs allege in their complaints that the Robinson Rancheria was unlawfully and prematurely terminated under the Act of August 18, 1958, P.L. 85–671, 72 Stat. 619, as amended,[1] thereby depriving them of federal Indian benefits and subjecting them to state and local taxation. They have sought declaratory and equitable relief rescinding the termination in this Court and monetary relief in the U.S. Court of Claims.[2]

---

1. P.L. 85–671 will be hereafter cited as the "Rancheria Act." It was amended by the Act of August 11, 1964, P.L. 88–419, 78 Stat. 390. Neither the 1958 Act nor the amendment were codified in Title 25 of the United States Code. The Act and the Amendment are included in Document # 64, the Agreed Statement of Facts, as Exhibits # 5 and # 6 thereto.

2. Plaintiffs filed their First Amended Complaint, containing six claims for relief, on December 30, 1974. The first four claims remain pending before this Court. The fifth claim, relating to woodlot access, has been dismissed without prejudice on stipulation of the parties. The sixth claim has been transferred to the

The jurisdiction of this Court is asserted under 28 U.S.C. § 1331; the action arises under the laws of the United States, specifically the California Rancheria Act, 72 Stat. 619, as amended 78 Stat. 390. The parties have stipulated that the amount in controversy, exclusive of costs and interests, exceeds the sum of $10,000 as to each named plaintiff. (Doc. # 64, p. 23.) The Court has independently examined this stipulation and has concluded that its estimate of the amount in controversy is reasonable and made in good faith in view of the rights involved in this action. Accordingly, the Court determines that it has jurisdiction of this action under 28 U.S.C. § 1331.[3] *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974); see also *Seber v. Board of County Commissioners,* 38 F.Supp. 731 (N.D.Okl.1941), *aff'd as modified,* 130 F.2d 663 (10th Cir., 1942), *aff'd* 318 U.S. 705, 63 S.Ct. 920, 87 L.Ed. 1094 (1943). The Court further determines that it has jurisdiction over the Lake County Tax Collector under 28 U.S.C. § 1343(3) and (4) as well as § 1331.

### FACTS

The facts are not in dispute and are set forth in an Agreed Statement of Facts submitted by the parties and made a part of the file herein. (Docs. # 64, 66). The Court hereby finds as facts for purposes of this opinion those items set forth in Documents # 64 and 66. Rule 52(a), Fed.R.Civ. Pro.

Briefly summarized, the facts are: In 1906, C. E. Kelsey, a San Jose attorney, was commissioned by the United States Indian Office to investigate and report on the conditions of California Indians. Kelsey found that Indians had been forced from agriculturally productive lands and were then living on worthless lands in distressing conditions. (Doc. # 64, Ex. # 3, pp. 3, 12.) He recommended to the Commissioner of Indian Affairs that the government purchase land for individual Indian families in tracts not exceeding ten acres. Kelsey recommended that the land purchased "be of good quality and proper water supply . . . [and be] . . . located in the neighborhoods in which the Indians wish to live." (*Id.* at pp. 23–24.)

Kelsey's report was submitted to Congress through the Commissioner of Indian Affairs and the Secretary of the Interior with a recommendation that his plan for California Indians be adopted. As a result of these actions, the Indian Office Appropriation Act of 1906 appropriated $100,000 and authorized the Bureau of Indian Affairs to:

"purchase for the use of the Indians of California now residing on reservations which do not contain land suitable for cultivation, and for Indians who are not now upon reservations in said State, suitable tracts or parcels of land, water, and water rights in said State . . . as the Secretary of the Interior may deem proper." Act of June 21, 1906, 34 Stat. 325, at 333 (Doc. # 64, pp. 10–11).

Parcels of land, called rancherias, were purchased under the 1906 Act and under subsequent acts to implement Kelsey's original scheme. In all, approximately 82 rancherias located primarily in Northern and Central California were purchased for California Indians.[4]

Robinson Rancheria, the subject of this action, was purchased by the United States in 1909 under authorization contained in the Acts of June 21, 1906, and April 30, 1908.[5] It was occupied upon its purchase by a band

---

Court of Claims pursuant to 28 U.S.C. § 1406(c), and remains pending in that Court.

**3.** The $10,000 jurisdictional requirement has been eliminated as to suits against agencies and officers of the United States by amendment to 28 U.S.C. § 1331 by the Act of October 21, 1976, P.L. 94–574, § 2, 90 Stat. 2721. Because the Court has determined that the requisite amount in controversy is present, the question

of the retroactivity of this provision need not be explored.

**4.** The appropriations for most of these purchases came from the 1914 "Homeless Indian" appropriation and its progeny. Act of August 1, 1914, C. 222, § 3, 38 Stat. 582, at 589.

**5.** The Act of 1906 may be found at 34 Stat. 325; the Act of 1908 at 35 Stat. 70.

of California Indians of Pomo stock. It was informally broken up by the band at the outset into unsurveyed parcels which were assigned to family heads as homesites. The Bureau of Indian Affairs apparently knew of and acquiesced in this system of informal allottment. Legal title to the land remained in the United States, although it was acknowledged that the United States held in trust for the California Indians. (Doc. # 64, p. 12–13.) [6]

In the decades following 1944, the usefulness of the Rancheria system was debated in the Executive Branch as well as in Congress. Congressional attitudes during this period reflected a desire rapidly to end Indian dependence on federal services, curtail the Indian services bureaucracy, and assimilate Indians into the mainstream of the United States culture. These objectives were to be accomplished in part by granting legal title to Rancheria land to individual Indians and terminating federal benefits and services to such Indians.

Authority for termination of federal supervision over, and distribution of the assets of Robinson Rancheria was provided by Congress in 1958. P.L. 85–671, 72 Stat. 619.[7] Section 1 of the Act provides that the assets of 41 named Rancherias (including Robinson Rancheria) "shall be distributed in accordance with the provisions of this Act." Section 2(a) requires that a plan be prepared by the Indians of each Rancheria or by the Secretary of the Interior after consultation with the Indians. But Section 2(b) manifests the clearly *permissive* character of any execution of the plan, mandating that the plan be carried out only if approved by a majority of the Indians voting in a referendum.

Section 3(c) of the Rancheria Act, the section critical to this action, requires the Secretary to undertake certain action with respect to Rancheria water systems before conveying the land outright to the Indians. That section provides:

"Before making the conveyances authorized by this Act on any rancheria or reservation, the Secretary of the Interior *is directed*: ...

(c) to install or rehabilitate such irrigation or domestic water systems *as he and the Indians affected agree*, within a reasonable time, should be completed by the United States." (Emphasis added.)

Acting under authority conferred upon the Secretary by Section 2(a) of the 1958 Act, the Bureau of Indian Affairs met with the Indians of the Robinson Rancheria and developed a tentative plan for the distribution of the Rancheria's assets. Preliminary approval was given to the plan by the Commissioner of Indian Affairs and a "general notice" of the plan was given to proposed Indian distributees pursuant to an implementing federal regulation, 25 C.F.R. § 242.4. After a 30 day appeal period had expired, the plan was finally approved and submitted to a referendum vote of the distributees. The plan as submitted was accepted by a vote of 24 "yes" and 1 "no" and became effective on March 10, 1960.

As approved and accepted, the Distribution Plan called for conveyance of the Rancheria's lands to 28 named Indian distributees. The plan also provided that certain Rancheria lands (including a church lot, woodlot, cemetery, and three small well lots) would be conveyed to a "legal entity" to be held for communal purposes. Deeds were subsequently issued to distributees and recorded. A deed to the communal areas was issued to the Robinson Pomo Association, an unincorporated association formed through the efforts of the Bureau and subscribed to by Indian distributees, and recorded. The assets of Robinson Rancheria were distributed in this fashion between 1961 and 1963. *Significantly, the plan made no provision regarding general water, sanitary, or irrigation systems on the Rancheria.*

**6.** In addition to the Robinson Rancheria proper, which was occupied by the band, a Secretarial Order of 1907 set aside 160 acres as a wood reserve. This tract, known as the Woodlot, is not inhabited.

**7.** The 1958 Act was amended by the Act of August 11, 1964, P.L. 88–419, 78 Stat. 390.

On August 11, 1964, before the Secretary had published an official notice of termination of the Robinson Rancheria in the Federal Register, Congress amended the 1958 Act. Included in the amendment was a revised Section 3(c) which provided as follows:

"Before making the conveyances authorized by this Act on any rancheria or reservation, the Secretary of the Interior *is directed*: * * * (c) to construct, improve, install, extend, or otherwise provide, by contract or otherwise, sanitation facilities (including domestic and community water supplies and facilities, drainage facilities, and sewage- and waste-disposal facilities, together with necessary appurtenances and fixtures) and irrigation facilities for Indian homes, communities and lands, as he and the Indians agree, within a reasonable time, should be provided by the United States: *Provided*, That with respect to sanitation facilities, as hereinbefore described, the functions specified in this paragraph, including agreements with Indians with respect to such facilities, shall be performed by the Secretary of Health, Education, and Welfare in accordance with the provisions of section 7 of the Act of August 4, 1954 (58 Stat. 674), as amended (42 U.S.C. § 2004a)."

On September 3, 1965, the Secretary published official notice of the termination of Robinson Rancheria in the Federal Register. 30 F.R. 11330. Publication of such a notice constitutes the Secretary's finding that all duties under the Rancheria Act had been performed and that Indian distributees and their families were "terminated", i. e. no longer eligible for federal benefits provided to Indians.[8]

The Agreed Statement of Facts includes a description of the water and sanitation facilities on the Rancheria before, during, and after termination. (Doc. # 64, pp. 19–32.) The statement establishes that: (1) there is no adequate irrigation for home gardens on the Rancheria; (2) the Rancheria has never had an adequate water system for domestic uses; shallow wells provide intermittent quality and quantity of water; (3) the inadequate water system has resulted in problems with sanitary waste disposal. Following enactment of the 1964 amendments to the Rancheria Act, no agreements were made between Robinson Rancheria Indians and the Secretaries of the Interior and/or Health, Education, and Welfare regarding the installation or upgrading of a domestic water system for the Robinson Rancheria.

Since the assets of the Rancheria were distributed in 1961, approximately 77% of its usable acreage (not including roadways) has passed into non-Indian ownership, and at least six new, non-Indian homes have been constructed thereon. Some of these homes have developed their own wells. (Doc. # 24, p. 27.) Plaintiffs in this action consist of named Indian distributees, members of their families, and their Indian transferees, some of whom remain on the Rancheria and some of whom have sold all or part of their land to third parties.

*Was the Termination of Robinson Rancheria Authorized by the California Rancheria Act of 1958?*

■ The essence of plaintiffs' argument in this action is that the termination of Robinson Rancheria was not authorized by the Act of 1958 because the Secretary failed to provide adequate water facilities before conveying the land to individual distributees. Defendants, through counsel, have conceded that the termination was unauthorized. (Defendant's Brief in Response, Doc. # 77.) Since interpretation of the

---

8. The 1959 Regulations (24 F.R. 4652, § 242.10) provide:

"When the provisions of a [distribution] plan have been carried out to the satisfaction of the Secretary, he shall publish in the FEDERAL REGISTER a proclamation declaring that the special relationship of the United States to the rancheria or reservation and to the distributees and the dependent members of their immediate families is terminated. The proclamation shall list the names of the distributees and dependent members of their immediate families who are no longer entitled to any services performed by the United States for Indians because of their status as Indians."

1958 Act is essential to the proper disposition of this action in all respects, the Court will not rely on the concessions of the parties, but will examine independently the duties of the Secretary and the rights of Indian distributees under the Act.

Section 3(c) of the 1958 Act *directed* the Secretary to install or rehabilitate water systems *before* conveying Rancheria land to Indian distributees. The 1964 amendment to the section retains the same mandatory structure, with two elaborations: (1) it made more specific the means of fulfilling the Secretary's obligation and the scope of the facilities covered; and (2) it added an obligation on the part of the Secretary of Health, Education, and Welfare with respect to sanitation facilities, including domestic water systems.

Both versions of Section 3(c) and the surrounding provisions of the Rancheria Act support the inference that Congress intended some sort of action by the Secretary regarding water facilities to be a *condition precedent* to termination. Nothing in the surrounding provisions or in the legislative history of the Act contradicts this inference. The exact nature of the action required by the Secretary, however, presents a more difficult problem. The section requires performance of such construction, installation, etc., as the Secretary and the Indians "*agree*, within a reasonable time, should be provided by the United States." The mandate of this section could be regarded as no more than a dictation of terms by the Secretary. Under this interpretation, a failure of agreement or passage of a reasonable time without agreement would extinguish the Secretary's duties and the corresponding rights of the Indians.

 But such an interpretation would drain any content from the Rancheria Act and would conflict with established law governing the interpretation of legislation for the benefit of Indians. As the Supreme Court recognized in passing in *Northern Cheyenne Tribe v. Hollowbreast*, 425 U.S. 649, 96 S.Ct. 1793, 1797, n. 7, 48 L.Ed.2d 274 (1976) "statutes passed for the benefit of the Indians are to be liberally construed, and all doubts are to be resolved in their favor." See also, *Bryan v. Itasca County*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976); *Squire v. Capoeman*, 351 U.S. 1, 6–7, 76 S.Ct. 611, 614–615, 100 L.Ed. 883 (1956); *Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 89, 39 S.Ct. 40, 42, 63 L.Ed. 138 (1912); *Worchester v. Georgia,* 31 U.S. (6 Pet. 515) 350 (1832). The Court of Appeals for this circuit has also termed the canon of construction favoring Indians "a fundamental postulate," *Santa Rosa Band of Indians v. Kings County*, 532 F.2d 655, 660 (9th Cir. 1975), and explained its significance as follows:

"This principle is somewhat more than a canon of construction akin to a Latin maxim, easily invoked and as easily disregarded. It is an interpretive device, early framed by John Marshall's legal conscience for ensuring the discharge of the nation's obligation to the conquered Indian tribes. The federal government has long been recognized to hold, along with its plenary power to regulate Indian affairs, a *trust status toward the Indian —a status accompanied by fiduciary obligations.* [Citations omitted.] While there is legally nothing to prevent Congress from disregarding its trust obligations and abrogating treaties or passing laws inimical to the Indians' welfare, the Courts, by interpreting ambiguous statutes in favor of Indians, attribute to Congress an intent to exercise its plenary power in the manner most consistent with the nation's trust obligations." 532 F.2d at 660 (emphasis added).[9]

The above quoted language applies with particular force to the statutory scheme

---

**9.** Principles of the law of trusts have been used to determine the nature and scope of federal obligations to the Indians. *Coast Indian Community v. United States*, 550 F.2d 639 (U.S.Ct. Cl., 1977). The relationship of the federal government and the Indians has also been characterized as "that of a ward to his guardian." *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831). See also *Gladys Stray Calf v. Scott Land and Livestock Co., et al.*, No. 75–1946 (C.A. 9, December 30, 1976), p. 5–6 (Wallace, J., dissenting).

involved in the case at bar. Here, Congress is attempting to end its traditional trust relationship with a group of Indians and to place them on the road to economic self-sufficiency. It was the manifest intent of Congress in enacting the Rancheria Act to grant to Indian distributees economic resources in fee simple that would enable them to sustain themselves as productive and useful citizens, independent of collateral federal programs and benefits. Obviously, of critical importance in such a transformation is conveyance of livable and agriculturally viable land. And, as recent events in California abundantly illustrate, water is an indispensable incident of such land.

The above considerations demand that Section 3(c) be construed to require more than mere agreement or failure to agree within a certain time to discharge the Secretary's obligation. The Secretary must come to the bargaining table as a fiduciary or trustee of the Indians. He must ensure that genuine, good faith bargaining is undertaken by two sides which are fully and competently represented. He must be ready, willing, and able to consider the reasonable needs of the Indians and their land. Finally, and most critically, the Secretary must bear ultimate responsibility for the fairness of the result, measured according to the purposes of the Act.

Judged according to the principles stated above, the Secretary has fallen far short of his obligations in this case. The Indians of the Robinson Rancheria were not represented by counsel in negotiating and approving the termination agreement. There is no evidence that the Secretary ever evaluated or considered the water system; the system today is inadequate. The Secretary has ensured neither fairness of procedure nor fairness of result in the Robinson Rancheria water system; therefore, equitable relief is appropriate.

*Scope of Appropriate Relief.*

At the Court's request, both parties submitted proposed forms of judgment and decree and briefed the issues of relief. The proposed forms and briefs do not reveal any irreconcilable differences regarding the scope of relief. Both parties agree on the fundamental issue—Robinson Rancheria must be "unterminated" and its distributees and their families must be given the opportunity to regain federal benefits lost through termination. Several additional considerations have moved the Court toward the particular form of judgment adopted; these will be briefly discussed to account for the Court's particular exercise of equitable discretion in this case.

First, the Indian distributees are entitled to prompt relief restoring their federal benefits, but respecting the vested rights in the Rancheria land which they have acquired through the operation of federal regulations. See, 25 C.F.R. § 242.7 (1960); 24 F.R. 4652–4654 (June 9, 1959). This will be accomplished through a declaration that the termination of Robinson Rancheria is void and an order directing the Secretary of the Interior to rescind the notice of termination and restore all federal benefits. Appropriate notice to Rancheria Indians of this action will be given.

Second, the rights of third party non-Indian good faith purchasers, who now hold 77% of the residential acreage on the Rancheria, must be protected. These transferees may have taken record title without knowledge of the intricacies of the fiduciary obligations of the Secretary and any resulting ownership defects. This will be accomplished through a declaration that only Indian distributees or their Indian transferees hold under voidable deeds. Only these persons will have the option of reconveying to the government. Those distributees who sold their land will retain their right to pursue monetary remedies in the Court of Claims.

Third, the state tax status of Rancheria land is dealt with in accordance with a Stipulation executed by the parties and filed with the Court on June 7, 1976. In that stipulation, the Tax Collector of Lake County stated her intention not to appear further in this action and stipulated to a permanent injunction regarding tax action in the event this Court found the Robinson Rancheria termination unlawful. (Doc. # 67.)

For the reasons stated above and good cause appearing:

IT IS HEREBY ORDERED that the Clerk of this Court shall enter judgment in this action as hereinafter set forth.