Mabel DUNCAN (aka Mabel Knight); Ivan Anderson; Severine Mitchell; Dubert Mitchell; Dorie Timmons; William F. Timmons, Jr.; Faron Timmons; Flint Timmons; Alvin Anderson; Wilbur Augustine (aka Wilburn Augustine); Maud Boggs; Barbara White; and Elsie Wilson, Plaintiffs,

v.

The UNITED STATES of America, Defendant.

No. 10–75.

United States Claims Court.

Feb. 28, 1991.

have learned informally that further pursuit of the request would be unproductive.

Lester J. Marston, Ukiah, Cal., atty. of record for plaintiffs, acting for California Indian Legal Services.

Susan V. Cook, Washington, D.C., atty. of record for defendant, with whom was Asst. Atty. Gen. Richard B. Stewart.

## ORDER FOR ENTRY OF JUDGMENT

HARKINS, Senior Judge.

Plaintiffs, Pomo Indians identified with the Robinson Rancheria, a small Indian reservation located in Lake County, California, filed actions in the District Court, Northern District of California, on August 19, 1971, that attacked the termination by the United States of their rancheria status. Plaintiffs' alleged that the Robinson Rancheria was unlawfully and prematurely terminated under the California Rancheria Act, as amended. Pub.L. No. 85–671, 72 Stat. 619 (Aug. 18, 1958); and Pub.L. No. 88–419, 78 Stat. 390 (Aug. 11, 1964). The complaint sought declaratory and equitable relief to rescind the termination, and monetary damages. The parties stipulated that the amount in controversy, exclusive of costs and interests, exceeded the sum of $10,000 as to each named plaintiff. Accordingly, the monetary claims were transferred to the United States Court of Claims on January 17, 1975, under 28 U.S.C. § 1406(c) (1976). Historical background of the California rancheria system, and prior action on plaintiffs' claims, are reported in *Duncan v. Andrus*, 517 F.Supp. 1 (1977); *Duncan v. United States*, 597 F.2d 1337, 220 Ct.Cl. 1 (1979) (*Duncan I*), *vacated and remanded*, 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 255 (1980); *Duncan v. United States*, 667 F.2d 36, 229 Ct.Cl. 120 (1981) (*Duncan II*), *cert. denied*, 463 U.S. 1228, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1983).

In *Duncan v. Andrus*, the district court on March 22, 1977, declared the termination of Robinson Rancheria was unlawful and void, and directed the Secretary of the Interior to rescind the September 3, 1965, notice of termination and to restore all federal benefits. The district court's decision was based primarily on the Government's failure to provide functioning water and sanitary facilities. On the basis of the parties Agreed Statement of Facts, the District Court concluded:

> The statement establishes that: (1) there is no adequate irrigation for home gardens on the Rancheria; (2) the Rancheria has never had an adequate water system for domestic uses; shallow wells provide intermittent quality and quantity of water; (3) the inadequate water system has resulted in problems with sanitary waste disposal. Following enactment of the 1964 amendments to the Rancheria Act, no agreements were made between Robinson Rancheria Indians and the Secretaries of the Interior and/or Health, Education, and Welfare regarding the installation or upgrading of a domestic water system for the Robinson Rancheria.

On plaintiffs' monetary claims, the Court of Claims granted plaintiffs' motion for partial summary judgment on the liability issue, and on December 2, 1981, remanded the case to its Trial Division for determination of the nature and extent of damages. The court's decision for plaintiffs on the liability issue was based on the breach by the Secretary of the Interior of United States trust responsibilities that had been imposed by the Rancheria Act. In *Duncan II*, the Court of Claims ruled:

> We, conclude, therefore, that in the legislation involving the Robinson Rancheria Congress clearly authorized and mandated compensation for federal breaches of trust—and this court is the proper forum (in this case, under 28 U.S.C. § 1491). The substantive claim for monetary compensation was created by the rancheria legislation (including the Rancheria Act) which formed (and continued) a general trust and laid down specific duties—and the right to sue the

Government in this court was completed by the Tucker Act, 28 U.S.C. § 1491.*

* *Duncan II,* 667 F.2d at 44.

The Court of Claims concluded that the Secretary's failure to provide adequate water and sanitation systems was central to the breach of trust. The Court of Claims reasoned that, under the doctrine of issue preclusion, it was bound by the prior decision of the court in *Duncan v. Andrus* that the Secretary had fallen far short of his obligations. The Court of Claims independently came to the same result:

Second, even if we are to canvass the issue anew, we come to the same result. Although the Secretary has discretion as to the amount and kind of water and sanitation systems, this does not allow him to terminate before ensuring a water supply sufficient to meet reasonable domestic needs. Section 3(c) of the Rancheria Act demonstrates a Congressional purpose to provide the Indians with sufficient water systems to become self-sufficient by the time of termination. *See* the discussion in *Duncan v. Andrus,* 517 F.Supp. at 1 (N.D.Cal.1977), and text at note 11, and note 11, *supra,* as well as our discussion *infra.* The uncontested facts show that the Secretary fell considerably short of providing sufficient water supplies to the Robinson Rancheria.*

* *Duncan II,* 667 F.2d at 45.

In its review of cases relative to damages recoverable for a breach of trust, the Court of Claims held that certain of plaintiffs' claims were plainly recoverable if proved, some types of damages clearly were not recoverable, and other kinds may or may not be recoverable, dependant on the factual nature and proof. *Duncan II,* 667 F.2d at 46–49.

After the December 2, 1981, remand, proceedings were stayed in the Trial Division pending disposition of the Government's petition for certiorari. After certiorari was denied on June 6, 1983, the parties were afforded an opportunity to negotiate a settlement of the damages issues. Frequently, after liability is established, counsel are able to stipulate the damages and further evidentiary proceedings are not required.

Notwithstanding periodic status reports from counsel of progress toward a negotiated settlement, an agreement on amounts due to plaintiffs was not forthcoming. On April 24, 1987, counsel were directed to prepare, under RUSCC Appendix G procedures, the damages issues for trial.

Trial sessions were held June 14 and 15, 1988. Trial was interrupted to permit plaintiff to marshall of evidence relative to damages for failure to provide adequate water and sanitation systems. Further trial sessions, scheduled to commence August 21, 1989, and later rescheduled to commence December 3, 1990, were postponed at counsel's request for permission to conduct further settlement negotiations.

On January 11, 1991, counsel filed two documents: (1) Stipulation for Entry of Judgment, and (2) Settlement Agreement. These documents purport to be a final resolution of all of the claims for damages of the Pomo Indians of the Robinson Rancheria for breach of trust as determined in *Duncan II.* The settlement is based upon: (1) a cash component, and (2) a housing component that requires extensive administration and coordination in the future by the Bureau of Indian Affairs and the Indian Health Service.

The period of time applicable to damages for imposition of state real property taxes was 1961–77. The period applicable to the failure to provide adequate water and sanitation facilities, at a minimum, extended from September 3, 1965 (Secretary published official notice of the termination of the Robinson Rancheria in the Federal Register) to March 22, 1977 (District Court voided the termination). During this 12-year period, some Indians were required to haul water for household use over extensive distances in gallon containers, and available sanitary facilities were inoperable because of lack of water. The final settlement provides a cash component that totals $70,000, payable to eight plaintiffs, and a housing component to seven plaintiffs, with a total value of approximately $330,000. The dollar value of the settlement appears to be minimal in view of the hardships to the Indians because of the lack of water.

The history of the original breach of trust does not inspire confidence that the housing component will be realized.

■ The settlement has been negotiated by counsel and is requested by the parties. A court may not set aside a settlement requested by the parties unless its terms are patently unfair, clearly inadequate, or unreasonable in the light of all the circumstances.

■ Representation for plaintiffs in these claims has been provided by the California Indian Legal Services (CILS), a federally funded nonprofit corporation organized to provide free legal services to Indians and Indian tribes who meet certain income eligibility guidelines. Defendant has been represented by attorneys from the Department of Justice. Since 1971, there have been three counsels of record for plaintiffs, and five counsels of record for defendant. Lester J. Marston has been counsel of record for plaintiffs since July 23, 1985; Susan V. Cook has been counsel of record for defendant since December 12, 1983.

The settlement terms have been approved as follows:

CILS, by **Stephen V. Quesenberry,** Director of Litigation, has confirmed that the settlement accords with procedures established by CILS.

**Lester J. Marston** negotiated and executed the settlement documents. Each plaintiff has been provided, in writing, the terms of the Government's formal offer, has had the terms explained in conferences with Mr. Marston, has advised Mr. Marston the settlement agreement was understood, and expressly has authorized execution of the settlement documents.

*Department of Justice* approvals:

**Richard B. Stewart,** Assistant Attorney General, Environment & Natural Resources Division

**William M. Cohen,** Chief, General Litigation Section, Environment & Natural Resources Division

**Susan V. Cook,** Attorney, General Litigation Section, Environment & Natural Resources Division, negotiated and executed settlement documents.

*Department of the Interior* approvals:

**Thomas A. Sansonetti,** Solicitor, Principal legal advisor to the Secretary of the Interior

**William G. Lavell,** Associate Solicitor, Division of Indian Affairs

**Charles B. Hughes,** Deputy Associate Solicitor, Division of Indian Affairs

**Scott Keep,** Assistant Solicitor, Branch of Tribal Government and Alaska, Division of Indian Affairs

**Stevens K. Linscheid,** Attorney, Division of Indian Affairs—In the development of the proposed settlement in this litigation, Mr. Linscheid served as legal adviser to the Sacramento Area Office of the Bureau of Indian Affairs and as liaison between the Department of Justice and the Bureau of Indian Affairs.

*Bureau of Indian Affairs* approvals:

**Ronald M. Jaeger,** Sacramento Area Director—Area Line Officer—Responsible for the overall operations and management of all BIA Programs within the Sacramento Area Office jurisdiction.

**Michael R. Smith,** Deputy Sacramento Area Director—Staff Assistant—Responsible to the Area Director for the overall operations of the BIA Programs within the Area Office jurisdiction.

**Charles F. Nelson,** Area Housing Program Officer—Area Housing Specialist—Responsible to the Deputy Area Director for the operation and management of the Housing Improvement Program within the Area office jurisdiction.

**Harold M. Brafford,** Superintendent, Central California Agency—Agency Line Officer—Responsible for the overall operation and management of all the BIA Programs within the Central California Agency Office jurisdiction.

**T. Joe Mashunkashey,** Housing Program Specialist, Centra California Agency—Agency Housing Specialist—Responsible to the Agency Superintendent for the operation and management of the Housing Improvement Program within the Central California Agency Office jurisdiction.

*Department of Health & Human Services* approvals:

**Duke McCloud,** Senior Attorney, Office of General Counsel, Public Health Division

**Bruce T. Ferris,** Director, Division of Sanitation Facilities Construction, California Area Office, Indian Health Service—Engineer in charge of planning, development and installation of water and wastewater disposal facilities under agreement.

The Stipulation for Entry of Judgment and the Settlement Agreement are attached to and incorporated in this Order. The Clerk is directed to enter judgment in accordance therewith.

## APPENDIX

### STIPULATION FOR ENTRY OF JUDGMENT

COMES NOW, plaintiffs and defendant, by and through their attorneys of record, hereby stipulate as follows:

1. This case is the result of a transfer of a portion of a matter initially filed as *Duncan v. Andrus* on August 19, 1971, in the United States District Court for the Northern District of California.

2. In 1975, plaintiffs' claims for monetary relief in excess of the $10,000 jurisdictional limit of the United States District Court were transferred to the Court of Claims pursuant to then 28 U.S.C. § 1406(c).

3. It is hereby stipulated that the complaint shall be dismissed as to the following plaintiffs: Farron Timmons, Flint Timmons, Dubert Mitchell, Wilbur Augustine and William F. Timmons.

4. Along with this stipulation, the parties have executed a separate settlement agreement. This stipulation and the settlement agreement shall constitute a final resolution of all claims of the Pomo Indians of the Robinson Rancheria for breach of trust as determined in *Duncan v. United States*, 229 Ct.Cl. 120, 667 F.2d 36 (1981).

5. Judgment shall be entered in favor of plaintiffs and against the United States

as hereinafter described. To the extent the estate of an original plaintiff bears the name of a legal representative, the parties hereby stipulate that the complaint is deemed to be amended to substitute the name of the legal representative for that of the original plaintiff:

a. Estate of Mabel Duncan, Legal Representative Dorrie Timmons: $15,000.

b. Estate of Ivan Anderson, Legal Representative Lottie Anderson: $5,000.

c. Severine Mitchell: $5,000.

d. Elsie Wilson: $5,000.

e. Estate of Alvin Anderson, Legal Representative, Delores Etsitty: $15,000.

f. Estate of Maud Boggs, Legal Representative Alfretta Boggs Mix: $10,000.

g. Barbara White: $5,000.

h. Dorrie Timmons: $10,000.

6. Plaintiffs agree to waive any and all claims they may have to attorney fees, court costs, litigation expenses, expert witnesses expenses and such other similar costs as may have been incurred.

7. The judgment entered pursuant to this stipulation shall be by way of compromise and settlement, shall not be construed as an admission by defendant of any legal or specific monetary liability as to any or all of plaintiffs' claims for monies, attorneys' fees, litigation costs and other expenses, interest, or any other kind of monetary relief or compensation, nor shall the judgment be interpreted to constitute a precedent or argument in this or any other case.

8. Plaintiffs and defendant agree that the entry of judgment pursuant to this stipulation and the settlement agreement shall constitute a full, complete and final resolution of all claims, legal or equitable, related in any way, directly or indirectly; and that this stipulation shall finally dispose of all rights, claims or demands which plaintiffs have asserted, or could have asserted, in this action.

9. The parties agree to execute any and all documents necessary to consummate this settlement.

10. Any judgment entered pursuant to this stipulation shall become final on the

day it is entered and the parties waive any right to appeal, or otherwise to seek review of this matter.

11. It is understood that nothing in this or any other agreement regarding the settlement of this litigation shall be construed so as to deprive a federal official of his authority to revise, amend or promulgate regulations; nor shall anything be construed to commit a federal official to expend funds not appropriated by Congress. Furthermore, the sole remedy of the plaintiffs for the failure of defendant to comply with the terms of this stipulation or the settlement agreement shall be to set aside the judgment entered pursuant to this stipulation and reinstate the current action.

Dated: January 10, 1991.

Respectfully submitted,

CALIFORNIA INDIAN LEGAL SERVICES

By: /s/ Lester J. Marston
LESTER J. MARSTON
200 W. Henry Street
P.O. Box 488
Ukiah, California 95482
(707) 462–3825
Attorney for Plaintiffs

Dated: January 9, 1991.

By: /s/ Susan V. Cook
SUSAN V. COOK
Environment and Natural
Resources Division
Department of Justice
P.O. Box 663
Washington, D.C. 20044–0663
(202) 272–6667
Authorized Representative
of the Attorney General
Attorney for Defendant

## SETTLEMENT AGREEMENT

COMES NOW, plaintiffs and defendant, by and through their attorneys of record, and hereby agree to settle this matter as follows:

1. Plaintiffs and defendant have engaged in good faith settlement negotiations to avoid further litigation in the Claims Court and in the Court of Appeals for the Federal Circuit.

2. The parties agree with respect to each individual plaintiff as follows:

a. Estate of Mabel Duncan (asserted representative: Dorrie Timmons). Housing component: none. Cash payment: $15,000.

b. Estate of Ivan Anderson (asserted representative: Lottie Anderson). Housing component: new housing. Cash payment: $5,000.

c. Severine Mitchell. Housing component: new housing. Cash payment: $5,000.

d. Elsie Wilson. Housing component: new housing. Cash payment: $5,000.

e. Estate of Alvin Anderson (asserted representative: Delores Etsitty). Housing component: HIP housing repairs would be provided for her existing owned residence in San Jose, CA, as needed up to the regulatory ceiling of $20,000. Cash payment: $15,000.

f. Estate of Maud Boggs (asserted representative: Alfretta Boggs Mix). Housing component: HIP housing repairs would be provided for her existing owned residence in Chico, CA, as needed up to the regulatory ceiling of $20,000. Cash payment: $10,000.

g. Barbara White. Housing component: new housing. Cash payment: $5,000. As preconditions to being entitled to receive new housing pursuant to this agreement, Barbara White agrees to: (1) within six months of entry of judgment by the court, obtain sufficient assignment or ownership interest on Old Robinson to comply with Housing Improvement Program (HIP) regulations; and (2) establish to the satisfaction of the Bureau of Indian Affairs within six months of entry of judgment that she does not retain any ownership in any house elsewhere.

h. Dorrie Timmons. Housing component: new housing. Cash payment: $10,000. As preconditions to being entitled to receive new housing pursuant to this agreement, Dorrie Timmons agrees: (1) to divest herself of any ownership

interest whatsoever in the mobile home which is her current residence; and (2) to acquire a site for the construction of a new residence on the Old Robinson Rancheria or the Woodlot which site is acceptable to the BIA and the Indian Health Service (including compliance with HIP housing ownership regulations). It is further agreed that if the site chosen is located on the Woodlot, Timmons is responsible for providing all necessary power and adequate water ('adequate' for these purposes shall be defined as 4–5 gpm).

i. It is expressly understood that the following terms and conditions are applicable to all of the above plaintiffs.

3. The parties agree that the water supply and wastewater disposal facilities as well as housing in this agreement are being provided expressly in the interest of compromising and settling this litigation, and nothing contained herein shall be construed as precedent for the administration of these programs in any other context.

4. Within sixty days from the entry of judgment in this matter the Bureau of Indian Affairs (BIA) and the Indian Health Service (IHS), Department of Health and Human Services, will work together to develop a written plan of action, which will be furnished to plaintiffs, for the construction of the housing and water supply and wastewater facilities provided for in this agreement. During this time they will also meet with the plaintiffs to identify the actual sites for the construction of the new housing.

5. Within the subsequent 120 days the IHS will complete all work including constructing and evaluating test wells, performing soil analysis and completing preliminary engineering design to determine if the housing sites can be served with a potable water supply and wastewater disposal facilities.

6. At the end of the 120 days, IHS will certify in writing to the BIA whether or not the particular housing sites being examined are suitable for the construction of new housing and the installation of water supply and wastewater disposal facilities. No housing construction shall begin until the housing site is approved in writing by the IHS.

7. The new HIP housing and the water supply and wastewater disposal facilities provided for in this agreement shall be constructed within one year of the certification of the sites as suitable by the IHS.

8. The HIP housing repairs provided for in this agreement shall be provided by the BIA within one year of the date of entry of judgment in this matter.

9. The housing benefits provided for in this agreement shall be administered directly by the BIA.

10. The parties agree that those plaintiffs designated to receive HIP housing benefits are currently eligible for those benefits notwithstanding 25 C.F.R. § 256.5(b) (1989), which shall be deemed waived as necessary to permit plaintiffs to participate in this settlement.

11. With the exception of the preceding paragraph, all other HIP regulations and requirements *will apply*, including but not limited to cost limitations, appropriate size of house, required ownership interest, transfer of ownership, etc.

12. There shall be a $45,000 maximum for new housing and $20,000 maximum for housing repairs. This means that the BIA may spend *up to* those amounts, but may also spend *less than* those amounts if the BIA can contract to provide standard housing or necessary repairs for a lesser amount. Nothing in this agreement shall prevent the BIA from subsequently agreeing to raise the $45,000/$20,000 maximum housing amounts provided for in this agreement, but the BIA shall be under no obligation to do so. The size of the house, where applicable, will be based on the established need of each plaintiff in accordance with HIP housing regulations, which include consideration of family size. (25 C.F.R. Part 256 (1989)).

13. The obligation of the BIA pursuant to this agreement to provide housing benefits to plaintiffs is expressly contingent upon the ability of the IHS to deliver ade-

quate (in quality and quantity) water supply and wastewater disposal facilities to the construction sites, as provided elsewhere in this agreement. The assurance and eventual actual delivery of such systems are essential to this agreement.

14. The obligation of the BIA pursuant to this agreement to provide housing benefits to plaintiffs is expressly contingent upon plaintiffs providing adequate safeguards for housing against flooding, through one or more of the following: (a) insurance (25 C.F.R. § 256.9); (b) site location; and/or (c) fill material necessary to properly construct the house. Plaintiff will also be responsible for providing fill material under and around the house where it is required to raise the level of the house to construct a satisfactory wastewater disposal facility. Any HIP funds remaining in the maximum $45,000 new housing amount after awarding a contract for the construction of a house that complies with HIP housing regulations (25 C.F.R. Part 256 (1989)) may be used for fill and/or site preparation costs. However, it is understood that this maximum amount might not be sufficient to cover the construction of both the house and all costs of fill material and/or site preparation. In that case, the costs of fill material and/or site preparation remain the responsibility of plaintiffs as provided in the first sentence of this paragraph. The IHS will be responsible for providing any fill material in the drainfield area.

15. The plaintiffs for whom housing is provided pursuant to this settlement agree to live in such housing as their sole and permanent residence, and specifically agree that the requirements of 25 C.F.R. § 256.4(d)(4) shall apply. In the case of new housing constructed pursuant to this agreement, plaintiffs shall establish sole residence in such housing within 120 days after completion of construction. Failure to comply with the terms of this paragraph shall result in plaintiffs being liable to the BIA for the full amount of the HIP grant provided to construct the house.

16. The plaintiffs for whom housing is provided pursuant to this agreement agree that as a precondition to receipt of HIP housing benefits, they shall divest themselves of any ownership interest they may hold in any other house or residence, except when such house or residence will be demolished upon the completion of construction of the new replacement housing; provided, however, that a plaintiff may continue to use a structure currently on the property for purposes other than human habitation, such as storage. However, Dorrie Timmons specifically agrees to divest herself of ownership interest in her mobile home as provided in paragraph 2h of this agreement.

17. The location of new housing constructed pursuant to this agreement shall be limited to sites within Old Robinson Rancheria, the Woodlot, or New Robinson Rancheria, except as otherwise provided in paragraph 20.

18. Defendant, by and through the IHS, shall design, fund, and construct community water supply and individual wastewater disposal facilities serving the new houses which are constructed on the Old Robinson Rancheria pursuant to this agreement. Such funds shall only be provided upon a determination by the IHS in its discretion that the engineering, construction and operation of such systems to service the homes are feasible, and that they will meet all applicable laws and regulations regarding such facilities. The adequacy of such systems shall be evaluated and determined in the discretion of the IHS.

19. In the event that suitable community water supply and/or individual wastewater disposal facilities cannot be developed at Old Robinson Rancheria, plaintiffs shall have ninety (90) days to provide BIA and IHS with an alternative site at the Woodlot or New Robinson Rancheria which meet the following conditions. If the alternative site is located on the Woodlot, the particular plaintiff involved will be responsible for providing power as well as adequate water supply prior to the construction by defendant of either housing or a wastewater disposal facility. Adequate for these pur-

poses shall be defined as approximately 4–5 gpm. If the alternative site is located on New Robinson Rancheria, the site must be so located that the IHS can connect the new house to the existing community water and sewerage systems.

20. If a plaintiff is unable to obtain an acceptable new housing site on Old Robinson Rancheria, New Robinson Rancheria or the Woodlot, the BIA in its discretion may provide HIP housing benefits at another location that otherwise complies with HIP housing regulations. In such a case, the IHS shall not be responsible for water supply and wastewater disposal facilities.

21. Plaintiffs agree that they will establish a utility organization to properly operate and maintain the water supply and wastewater disposal facilities, which organization will be in place and ready to operate prior to completion of construction of the facilities.

22. Plaintiffs agree and shall require that the utility organization agree to abide by the requirements of the standard IHS Memorandum of Agreement used for P.L. 86–121 Sanitation Facilities Construction Projects.

23. Each individual plaintiff agrees (in the case of individual facilities), and the plaintiffs shall require that the utility organization agree (in the case of community facilities), that title to the water supply and wastewater disposal facilities to be provided by the IHS under this agreement shall be transferred to either the organization or a plaintiff after construction and that organization or plaintiff, and not defendant or its entities, shall be responsible to operate and maintain them in good working order.

24. The IHS will drill test wells at up to two separate locations on the Old Robinson Rancheria in an attempt to locate and construct a potable community water supply of approximately 15–20 gallons per minute (GPM). The minimum yield that the IHS will approve for a domestic water supply will be approximately 10–12 gpm. IHS may, in its discretion, construct two smaller water supplies as long as together they provide a sufficient source of water within the meaning of this paragraph.

25. The water supply and wastewater disposal facilities to be constructed pursuant to this agreement shall meet all applicable state and local Lake County construction standards. General specifications for materials and construction of the water supply and wastewater disposal facilities shall be as set forth in the following documents:

*ON SITE SEWAGE DISPOSAL RULES*—Lake County Environmental Health Department, Lakeport, California.

Criteria For The Design of a Small Community Water System, Indian Health Service, California Area Office.

Typical Material and Construction Specifications for the construction of a Community Well and Water System, Indian Health Service, California Area Office.

26. The system design criteria shall be as follows:

A. *Population*

(1) The number of people per home will be 4.5 or the actual number permanently residing therein whichever is larger.

(2) The design population will be 50 percent greater than the existing population as calculated above (population growth factor).

B. *Domestic Water Demand*

(1) The average per capita water use will be assumed to be 125 gallons per day.

C. *Well and Pumping Capacity*

(1) The minimum dry season well yield and the pump shall be sufficient to provide the average daily demand in approximately 10 hours per day.

D. *Storage*

(1) *Gravity Storage*—Where feasible, gravity storage will be provided as long as the minimum working pressure at each home can be at least 20 psi. The volume will be sufficient to provide two days storage of the initial population and at least

one day of storage for the design population.

(2) *Hydropneumatic Storage*—Hydropneumatic storage will be provided where gravity storage is not feasible.

E. *Watermains, Servicelines and Appurtenances*

Water lines shall be sized so they provide acceptable pressure at the homes using a maximum hourly flow of approximately 4.0 times the average daily flow. All water lines, flush hydrants, meters and other appurtenances shall have a pressure rating of at least two times the maximum working pressure of the system.

F. *Treatment*

Based on numerous verbal and written reports, it is probable that the groundwater source for the proposed community water system will have concentrations of iron and manganese above the maximum levels recommended by the Environmental Protection Agency under the Safe Drinking Water Act. It is likely that hydrogen sulfide in objectionable concentrations will also be present. If these substances are present in the water source, studies will be performed to determine what treatment process is most appropriate with attention given to keeping the cost and complexity of operation and maintenance at a minimum. Based on experience in treating groundwater of similar quality in the area, consideration will be given to providing aeration and ion-exchange softeners.

G. *Quality of Materials and Construction*

The quality of all materials and construction shall be in accordance with all applicable American Waterworks Association (AWWA), American Society for Testing and Materials (ASTM), National Plumbing Code (NPC), and other accepted standards for the construction of community water systems.

27. At their option, plaintiffs may have their engineer review and comment to the IHS on the test well drilling, soil test results, final design, plans and specifications and the construction of the water supply and wastewater disposal facilities. IHS will review and consider incorporating into the design and specifications of the facilities to be constructed any comments received from plaintiffs' engineer. However, IHS retains sole discretion and authority with regards to the design, engineering, construction and preliminary operation of the facilities.

28. Plaintiffs agree to waive any and all claims they may have to attorney fees, court costs, litigation expenses, expert witnesses expenses and such other similar costs as may have been incurred.

29. The judgment entered pursuant to this agreement shall be by way of compromise and settlement, shall not be construed as an admission by defendant of any legal or specific monetary liability as to any or all of plaintiffs' claims for monies, attorneys' fees, litigation costs and other expenses, interest, or any other kind of monetary relief or compensation, nor shall the judgment be interpreted to constitute a precedent or argument in this or any other case.

30. Plaintiffs and defendant agree that the entry of judgment pursuant to this agreement shall constitute a full, complete and final resolution of all claims, legal or equitable, related in any way, directly or indirectly; and that this agreement shall finally dispose of all rights, claims or demands which plaintiffs have asserted, or could have asserted, in this action.

31. The parties agree to execute any and all documents necessary to consummate this settlement.

32. Any judgment entered pursuant to this agreement shall become final on the day it is entered and the parties waive any right to appeal, or otherwise to seek review of this matter.

33. It is understood that none of the terms of this agreement shall deprive a federal official of his authority to revise, amend or promulgate regulations; nor shall this agreement be construed to commit a federal official to expend funds not

appropriated by Congress. Furthermore, the sole remedy of a plaintiff for the failure of defendant to construct a suitable community water system or to otherwise comply with any of the terms or requirements of this agreement shall be to set aside the judgment pursuant to this settlement and reinstate the current action.

34. Any right of reinstatement of the litigation for failure of defendant to comply with any of the terms of this settlement with respect to housing, water supply and wastewater disposal facilities, shall be limited to the seven individual plaintiffs named herein, and shall be construed solely as an individual right based on defendant's failure to provide benefits agreed to with respect to that individual who seeks to reinstate the litigation.

35. It is hereby stipulated that the complaint shall be dismissed as to the following plaintiffs: Farron Timmons, Flint Timmons, Dubert Mitchell, Wilbur Augustine and William F. Timmons.

Dated: January 9, 1991.

Respectfully submitted,

CALIFORNIA INDIAN LEGAL SERVICES

By: /s/ Lester J. Marston
LESTER J. MARSTON
200 W. Henry Street
P.O. Box 488
Ukiah, California 95482
(707) 462-3825
Attorney for Plaintiffs

Dated: January 9, 1991.

By: /s/ Susan V. Cook
SUSAN V. COOK
Environment and Natural Resources Division
Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
(202) 272-6667
Attorney for Defendant