INTERNATIONAL FIDELITY
INSURANCE COMPANY,
Plaintiff,

v.

UNITED STATES, Defendant.

No. 96–715C.

United States Court of Federal Claims.

Aug. 31, 1998.

David W. Case, Ott & Purdy, P.A., Jackson, Mississippi, attorney of record, for plaintiff.

Deborah Y. Ho, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, with whom were Kathryn A. Bleecker, Assistant Director, David M. Cohen, Director, Civil Division, and Frank W. Hunger, Assistant Attorney General, attorneys of record, for defendant.

## OPINION

HORN, Judge.

The plaintiff, International Fidelity Insurance Company (IFIC), was the surety to a government contractor, Met–Pro Corporation (Met–Pro), on a United States Army Corps of Engineers (Corps of Engineers) contract for the cleanup of a petroleum tank farm at the former Greenville Air Force Base, Greenville, Mississippi. IFIC executed a payment bond for the cleanup contract. During contract performance, IFIC requested that Met–Pro send a letter to the Corps of Engineers, asking that remaining payments on the contract be made payable jointly to Met–Pro and IFIC. The Corps of Engineers modified the contract to implement the request, but subsequent to the contract modification sent a $67,054.52 check solely to Met–Pro. Met–Pro completed the contract, but, under the payment bond, IFIC was required to make payments totaling $89,087.93 to unpaid subcontractors and suppliers for labor and material provided to the contract. IFIC seeks $67,054.52 from the government, claiming that the Corps of Engineers should have written the check jointly to Met–Pro and IFIC, pursuant to the contract modification. Defendant has filed a motion to dismiss based on Rules 12(b)(1) and 12(b)(4) of the Rules of the United States Court of Federal Claims (RCFC). IFIC has filed a motion for summary judgment based on RCFC 56.

## FACTS

On March 31, 1992, the United States Army Corps of Engineers District, Vicksburg, Mississippi (Corps of Engineers), awarded contract number DACA3892–C–0044 (the contract) to Met–Pro Corporation (Met–Pro) for the cleanup of a petroleum tank farm at the former Greenville Air Force

Base, Greenville, Mississippi.[1] The face amount of the contract was $168,300.00 and called for demolition and removal of structures, and excavation and disposal of petroleum contaminated soil. The plaintiff, International Fidelity Insurance Company (IFIC), was the surety on the contract, executing performance and payment bonds for Met–Pro pursuant to the Miller Act, 40 U.S.C. § 270 *et seq.* (1994).[2]

On May 29, 1992, the Corps of Engineers issued a notice to proceed to Met–Pro, and work began on the contract on August 8, 1992. Beginning on October 6, 1992, and again on November 19, 1992, the contracting officer's representative sent Met–Pro letters noting that the contractor was behind schedule and asking for a plan to regain lost time. Subsequently, on December 21, 1992, the contracting officer's representative met with Met–Pro to discuss the contractor's failure to make satisfactory progress. Beginning on January 7, 1993, the Corps of Engineers began to receive letters from Met–Pro's subcontractors and suppliers, indicating that Met–Pro had not been making timely payments for labor and supplies on the contract. The letters were forwarded to both Met–Pro and IFIC. IFIC responded by letter, acknowledging receipt and informing the Corps of Engineers that IFIC was investigating the allegations contained in the letters and reserved all rights of the surety and its principal. IFIC's responses did not request the Corps of Engineers to take any action with regard to the letters.

On February 18, 1993, the Corps of Engineers sent a letter to Met–Pro calling attention to the contractor's failure to respond to the Corps of Engineers' earlier requests for a plan addressing progress on the contract. At this point, one estimate placed the work at approximately 80 percent complete.[3] On March 8, 1993, the contracting officer's representative sent a letter to Met–Pro referencing a meeting at the work site at which Met–Pro's failure to make satisfactory progress was discussed. The letter from the Corps of Engineers directed Met–Pro to increase the work effort in order to improve progress, and for Met–Pro to submit a revised plan of operations and progress charts.

In a letter dated April 15, 1993, the contracting officer's representative provided Met–Pro with a revised completion date of February 27, 1993, and indicated that Met–Pro's "progress and job performance [continue] to lag." Four days later, on April 19, 1993, the contracting officer's representative sent Met–Pro a letter, with a copy to IFIC, stating that "an interim unsatisfactory evaluation" of Met–Pro's performance was being considered because "[s]uppliers have advised me that they have not received payment in a timely manner." The letter also noted Met–Pro's failure to improve performance. On May 21, 1993, an interim unsatisfactory rating was issued by the contracting officer, with a copy to IFIC, following Met–Pro's failure to respond to the Corps of Engineers' April 19, 1993 letter.

On June 7, 1993, the contracting officer's representative sent Met–Pro a letter, with a copy to IFIC, stating as follows:

> Little to no progress has been made on subject contract since early May telecon with your Mr. Bates.
>
> Within five days of receipt of this letter, I am recommending Termination for Default, unless I receive a viable plan for a speedy completion of this contract.

On June 16, 1998, Met–Pro's president, at IFIC's request, sent a registered letter to the contracting officer's representative, stating:

---

1. The same contract was the subject of an Armed Services Board of Contract Appeals opinion issued May 14, 1998, which dealt with differing site conditions (excessive subsurface petroleum contaminated soil). The contractor's appeal of the contracting officer's decision in that case was sustained, and the matter remanded to the parties for resolution of quantum. *Appeal of Met–Pro Corp.*, ASBCA 49694, 1998 WL 248284 (May 14, 1998).

2. A performance bond secures performance of a contract; a payment bond insures proper payments to persons supplying labor and material on a contract. 48 C.F.R. § 28.001 (1992). The latter type of bond is implicated in the matter before this court.

3. The 80 percent figure comes from a memorandum for the record by a safety and occupational health specialist describing a safety inspection.

We herewith advise that all future payments for the subject contract be made payable and remitted as follows:

Met–Pro Corporation

and International Fidelity

Insurance Company

P.O. Box 36633

Birmingham, Alabama 35236

All other correspondence on this project shall continue to be sent to our Birmingham address.

Should additional information be required to effect this new remittance address please advise.

Acting on Met–Pro's request, the Corps of Engineers unilaterally modified the contract to reflect that "all payments should be payable and remitted" to Met–Pro and IFIC at the address provided in the June 16, 1993 letter from Met–Pro's president to the contracting officer's representative. Contract Modification P00003, reflecting the change in payees, was signed on July 6, 1993 by the contracting officer with an effective date of the same day.

Shortly after Modification P00003 was signed, on July 9, 1993, the president of Met–Pro submitted "Pay Estimate No. 7" to the Corps of Engineers. On July 19 and 20, 1993, in response to the submission of Pay Estimate No. 7, the Corps of Engineers approved payment in the amount of $67,054.52. The payment form contained both Met–Pro's and IFIC's names, as well as the address requested on the June 16, 1993 letter from Met–Pro's president to the contracting officer's representative (and listed in Contract Modification P00003), and stated that it "includes modification thru: P00003." However, a check in the amount of $67,054.52 was issued on July 26, 1993 and made payable solely to Met–Pro.

A takeover agreement between the surety and the Corps of Engineers to complete the contract was never executed. Met–Pro completed work on the contract by August 17, 1993. However, as the surety for Met–Pro on the contract, IFIC made payments in the amount of $89,087.93, which were due to subcontractors and suppliers of labor and material furnished to the contract. In the above-captioned complaint IFIC seeks reimbursement from defendant in the amount of $67,054.52, the amount of the July 26, 1993 check paid solely to Met–Pro instead of jointly to Met–Pro and IFIC as required pursuant to Modification P00003. IFIC made demand on the government for payment of all remaining contract balances by letter dated February 14, 1995, and in the letter IFIC also raised the issue of the improper remittance of the $67,054.52 to Met–Pro alone.

## DISCUSSION

Defendant filed a motion to dismiss pursuant to RCFC 12(b)(1) and RCFC 12(b)(4) alleging lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted. The plaintiff filed a cross-motion for summary judgment pursuant to RCFC 56. The motion to dismiss will be addressed first. When considering a motion to dismiss, the court may consider all relevant evidence in order to resolve any disputes as to the truth of the jurisdictional facts alleged in the complaint. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988). The court is required to decide any disputed facts which are relevant to the issue of jurisdiction. *Id.*

The standard for weighing the evidence presented by the parties when evaluating a motion to dismiss for lack of jurisdiction pursuant to RCFC 12(b)(1), and a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(4), has been articulated by the United States Supreme Court, as follows: "in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *accord Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed.Cir.1989); *see also Alaska v. United States*, 32 Fed.Cl. 689, 695 (1995), *appeal dismissed*, 86 F.3d 1178 (Fed.Cir.1996). In rendering a decision, the court must presume that the undisputed factual allegations included in the complaint by a plaintiff are true. *Miree v. DeKalb County*, 433 U.S. 25,

27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d at 746; *Alaska v. United States*, 32 Fed.Cl. at 695.

The burden of establishing jurisdiction is on the plaintiff. *McNutt v. General Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Alaska v. United States*, 32 Fed.Cl. at 695; *Catellus Dev. Corp. v. United States*, 31 Fed.Cl. 399, 404 (1994). The court should not grant a motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted). Nonetheless, "conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir.1981), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983).

■ In order for this court to have jurisdiction over plaintiff's complaint, the Tucker Act, 28 U.S.C. § 1491 (1994), as amended 28 U.S.C.A. § 1491 (Supp.1998), requires that a substantive right, which is enforceable against the United States for money damages, must exist independent of 28 U.S.C. § 1491. The Tucker Act provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). The Tucker Act merely confers jurisdiction on the United States Court of Federal Claims; it does not create a substantive right that is enforceable against the United States for money damages. *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607, *reh'g denied*, 446 U.S. 992, 100 S.Ct. 2979, 64 L.Ed.2d 849 (1980) (*Mitchell I*); *United States v. Testan*, 424 U.S. 392, 398–99, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *United States v. Connolly*, 716 F.2d 882, 885 (Fed.

Cir.1983) (*en banc*), *cert. denied*, 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984).

■ Moreover, a waiver of the traditional sovereign immunity "cannot be implied but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969) (citing *United States v. Sherwood*, 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941)). The individual claimants, therefore, must look beyond the jurisdictional statute for a waiver of sovereign immunity. *United States v. Testan*, 424 U.S. at 398, 96 S.Ct. 948. "[I]n order for a claim against the United States founded on statute or regulation to be successful, the provisions relied upon must contain language which could fairly be interpreted as mandating recovery of compensation from the government." *Cummings v. United States*, 17 Cl.Ct. 475, 479 (1989), *aff'd*, 904 F.2d 45 (Fed.Cir.1990) (citations omitted); *see also United States v. Mitchell*, 463 U.S. 206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (*Mitchell II*) (citing *United States v. Testan*, 424 U.S. at 400, 96 S.Ct. 948 (quoting *Eastport Steamship Corp. v. United States*, 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967))); *Duncan v. United States*, 229 Ct.Cl. 120, 138, 667 F.2d 36, 47 (1981), *cert. denied*, 463 U.S. 1228, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1983).

According to RCFC 12(b)(4), "[a] motion to dismiss for failure to state a claim upon which relief can be granted is appropriate where the plaintiff cannot assert a set of facts which would support its claim." *Mitchell Arms, Inc. v. United States*, 7 F.3d 212, 215 (Fed.Cir.1993), *cert. denied*, 511 U.S. 1106, 114 S.Ct. 2100, 128 L.Ed.2d 662 (1994) (citing *Chang v. United States*, 859 F.2d 893, 894 (Fed.Cir.1988)). In determining a motion to dismiss under RCFC 12(b)(4), the court "must 'assume all well-pled factual allegations are true and indulge in all reasonable inferences in favor of the nonmovant.'" *Id.* (citing *Gould v. United States*, 935 F.2d 1271, 1274 (Fed.Cir.1991)). RCFC 12(b)(4) "mirrors" Rule 12(b)(6) of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 12(b)(6); *Maniere v. United States*, 31 Fed.Cl. 410, 419 (1994). The court is required to deny a motion pursuant to RCFC 12(b)(4) or Rule 12(b)(6), "unless it appears beyond doubt that

the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. at 45–46, 78 S.Ct. 99 (footnote omitted); *see also Maniere v. United States,* 31 Fed.Cl. at 419 (citing *Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.,* 988 F.2d 1157, 1160 (Fed.Cir.1993)).

Defendant contends that the complaint fails to establish subject matter jurisdiction. Defendant argues that:

A surety who initially issued performance and/or payment bonds guaranteeing completion of a Government contract, and subsequently undertakes contractor performance, may bring suit in its own name to secure funds due under the contract. In contrast, a surety who is not a party to the underlying contract and who does not execute a takeover agreement is not a contractor under the Contract Disputes Act (CDA) with respect to the underlying contract and it may not assert a claim pursuant [to] the CDA for an equitable adjustment.

IFIC contends that the modification by the CO [contracting officer] adding it as a payee created a third party beneficiary relationship between the Government and IFIC. IFIC has not, and cannot, demonstrate such status as a third-party beneficiary.

In response, the plaintiff points to paragraph 12 of the complaint, which states:

IFIC, as surety for and on behalf of Met–Pro, has been required to make payments under its Miller Act payment bond of no less than the full penal sum of the bond ($84,150), the exact amount to be proven at trial or further hearing in this cause, to subcontractors and suppliers for labor and materials supplied and used in the prosecution of Met–Pro's work on the Project. IFIC's payment of said claims under its bond creates a substantive right in favor of IFIC to claim recovery of monetary damages against Defendant in this Court for wrongful disbursement of contract funds under the equitable doctrine of subrogation.

■ It is settled law that the Tucker Act, coupled with the doctrine of equitable subrogation, provides subject matter jurisdiction to the court to determine a surety's claim against the government stemming from the alleged improper disbursement of contract funds. In *Balboa Ins. Co. v. United States,* 775 F.2d 1158 (Fed.Cir.1985), the United States Court of Appeals for the Federal Circuit held:

Decisions of our predecessor court and the Supreme Court make clear that a surety is not in the same position as that of a subcontractor or materialman. *E.g., United Electric Corp. v. United States,* 647 F.2d 1082, 1086, 227 Ct.Cl. 236, *cert. denied,* 454 U.S. 863, 102 S.Ct. 322, 70 L.Ed.2d 163 (1981). A suretyship is the result of a three-party agreement, whereby one party (the surety) becomes liable for the principal's or obligor's debt or duty to the third party obligee, *see United States v. United States Fidelity & Guaranty Co.,* 236 U.S. 512, 35 S.Ct. 298, 59 L.Ed. 696 (1915). Both the obligor-principal (the prime contractor) and the surety are liable to the obligee (here, the Government), and no suretyship exists in the absence of any of the three parties. In contrast to a subcontractor, which has no obligations running directly to or from the Government, *United States v. Munsey Trust Co. of Washington, D.C.,* 332 U.S. 234, 241, 67 S.Ct. 1599, 1602, 91 L.Ed. 2022 (1947) (and therefore possesses no enforceable rights against the United States), a surety, as bondholder, is as much a party to the Government contract as the contractor. If the surety fails to perform, the Government can sue it on the bonds. *E.g., Carchia v. United States,* 485 F.2d 622, 202 Ct.Cl. 723 (1973).

Although it is conceivable that under certain circumstances a surety could assert rights against the Government under the third-party beneficiary rule, *see Montana Bank of Circle, N.A. v. United States,* 7 Cl.Ct. 601, 611 (1985), or even as one in privity in contract with the Government, *see Hanover Insurance Co. v. United States,* 279 F.Supp. 851, 852 (S.D.N.Y. 1967); *cf. Martin v. National Surety Co.,* 300 U.S. 588, 598, 57 S.Ct. 531, 535, 81

L.Ed. 822 (1937) ("The terms of the bond are read into the contract"), the traditional means of asserting a surety's claim is under the equitable doctrine of subrogation. Almost ninety years ago, the Supreme Court stated: "That [plaintiff], as surety on the original contract, was entitled to assert the equitable doctrine of subrogation is elementary." *Prairie State Bank v. United States*, 164 U.S. 227, 231, 17 S.Ct. 142, 144, 41 L.Ed. 412 (1896). Later, in *United States Fidelity & Guaranty Co. v. United States*, 475 F.2d 1377, 201 Ct.Cl. 1 (1973) ... the Court of Claims clarified the respective rights of subcontractors and Miller Act sureties to sue the United States by explaining:

> [T]he surety was entitled to the benefit of all the rights of the laborers and materialmen whose claims it paid and those of the contractor whose debts it paid. The surety then is subrogated to the rights of the contractor who could sue the Government since it was in privity of contract with the United States. The surety is likewise subrogated to the rights of the laborers and materialmen who might have superior equitable rights to the retainage but no right to sue the [United States].

475 F.2d at 1382.

*Id.* at 1160–61. *See also National Surety Corp. v. United States*, 118 F.3d 1542, 1546 (Fed.Cir.1997) ("The Court of Claims, by whose precedent we are bound, has long recognized the surety's right to subrogation in the security held by the government. The subrogation right is equitable, in origin and implementation, and is established when the surety bonds are given.... The duty devolves upon the government to administer the contract, during the course of its performance, in a way that does not materially increase the risk that was assumed by the surety when the contract was bonded.") (citations omitted); *Transamerica Ins. Co. v. United States*, 989 F.2d 1188, 1195 (Fed.Cir. 1993) ("On the facts of this case, when there are no government claims to be counterba-

lanced, it would be against fairness and good conscience to allow the defaulting contractor to benefit, through the government's error, at the expense of the fully performing surety."); *Hartford Fire Ins. Co. v. United States*, 40 Fed.Cl. 520, 522 (1998) ("The traditional means of asserting a surety's claim ... is under the doctrine of equitable subrogation.") (citations omitted); *Transamerica Premier Ins. Co. v. United States*, 32 Fed.Cl. 308, 312 (1994) ("A surety can establish a right of subrogation either of two ways: by completing the contract pursuant to its obligation under the performance bond or by paying off materialmen's claims brought under the payment bond.") [4].

■ The complaint alleges that the plaintiff, under the contract's payment bond, was required to make payments totaling over $84,000.00 "to subcontractors and suppliers for labor and material supplied and used in the prosecution of Met–Pro's work on the Project." As observed earlier, when evaluating a motion to dismiss for lack of jurisdiction pursuant to RCFC 12(b)(1), the allegations of the complaint should be construed favorably to the pleader, and the court must presume that the undisputed factual allegations included in the complaint by a plaintiff are true. Presuming the allegations in the complaint to be true, and that IFIC paid subcontractors' and suppliers' claims under the contract's payment bond, the court concludes that it possesses subject matter jurisdiction over the plaintiff's claim pursuant to the Tucker Act and the doctrine of equitable subrogation.

■ Defendant next alleges that the complaint fails to state a claim upon which relief can be granted. Defendant argues that:

> There was no duty of any kind created between the Government and IFIC. The reason there was no duty created was because there was no notification by IFIC, as surety, to the Government of Met–Pro's potential default. As a surety, the only duty imposed upon the Government exists when and if the surety notifies it of a potential default.

4. The court in *Transamerica Premier* defines "materialmen" as subcontractors and suppliers on the contract. *Id.* at 310.

Defendant relies on *Balboa Ins. Co. v. United States*, 775 F.2d 1158 (Fed.Cir.1985), for the proposition that the surety must notify the government of the unsatisfied claims of subcontractors and suppliers before the government is placed in the role of a stakeholder, with a duty of care toward the surety as to unexpended contract funds. In *Balboa*, the United States Court of Appeals for the Federal Circuit quoted with approval an earlier United States Court of Claims case:

> [W]hen plaintiff [the surety] notified defendant of the unpaid claims of laborers and materialmen and asserted a claim to the unpaid contract balance, the defendant still held [as yet unpaid funds]. At that time, the Government asserted no claim to the [funds] so that the Government held that amount as a stakeholder with full knowledge that the surety and the assignee claimed a right to the money.
>
> We agree with the conclusion of the Court of Claims that, upon notification *by the surety* of the unsatisfied claims of the materialmen, the Government became a stakeholder with respect to the amount not yet expended under the contract that it holds at the time of notification of default.

*Id.* at 1161–62 (quoting *Great American Ins. Co. v. United States*, 492 F.2d 821, 825, 203 Ct.Cl. 592 (1974)) (citation omitted) (alterations in original) (emphasis added).

Defendant acknowledges that the contracting officer "had notice of problems with the contractor's performance and unpaid suppliers" but argues that constructive notice is insufficient to perfect a stakeholder's duty to a surety, citing *Fireman's Fund Ins. Co. v. United States*, 909 F.2d 495 (Fed.Cir.1990). In *Fireman's Fund*, the court focused on the absence of actual notice from the surety:

> Fireman's Fund [the surety] did not notify the government of Westech's [the contractor's] failure to pay its subcontractors and suppliers or ask that payments to Westech be withheld until ... almost five months after the government had fully released the retainage which Fireman's Fund now claims. That some subcontractors and suppliers had informed the government of Westech's payment deficiencies

prior to the release of the retainage does not substitute for notice by the surety and does not trigger the government's equitable duty to act with reasoned discretion toward it. Fireman's Fund simply cannot rely on Westech's subcontractors or the government to protect its interests. By definition and agreement the surety protects the government's interest, not the other way around.

> We see no reason to impose on the government a duty toward the surety whenever a subcontractor or supplier complains of late or nonpayment by the contractor. Only the contract should limit the government's flexibility in resolving payment disputes so minor, and perhaps so inevitable, that the surety itself doesn't consider the contractor's role in them a potential default under the bond. Only when the surety may be called upon to perform, that is, only when it may become a party to the bonded contract, should the government owe it any duty. The surety knows best when this may occur; consequently, only notice by the surety triggers the government's equitable duty.

*Fireman's Fund Ins. Co. v. United States*, 909 F.2d at 499. *Fireman's Fund* involved the absence of any surety notice to the government until a point at which the contract funds were long gone. In contrast, in the instant case, the surety spoke through the prime contractor, Met–Pro, and when the contractor requested that payments be made jointly to Met–Pro and the surety plaintiff, there were remaining funds on the contract. Also in contrast to *Fireman's Fund*, as a result of Met–Pro's request, the contract was explicitly modified by the government for the express purpose of making Met–Pro and IFIC joint payees on future payments under the contract. This court observes that in the *Fireman's Fund* language reproduced above ("[o]nly the contract should limit the government's flexibility"), there is a suggestion that the Court of Appeals for the Federal Circuit could consider such a contract modification to be significant factor. The Circuit Court in *Fireman's Fund* also wrote: "[w]e are unwilling to read into the contract a limitation on discretion that the parties did not them-

selves contemplate," *id.* at 498, again implying that, had there been a contract modification limiting the government's discretion in disbursements, it could have been a significant factor. Similarly, although the *Balboa* court emphasized the need for the surety's notice to the government, a contract modification establishing joint payment procedures had not been issued and was not before that court, *see Balboa Ins. Co. v. United States,* 775 F.2d 1158.

In *National Surety v. United States,* 118 F.3d 1542 (Fed.Cir.1997), the Federal Circuit distinguished *Fireman's Fund Ins. Co. v. United States,* and determined that it was not controlling. In *National Surety,* the contract required the government to retain ten percent of all progress payments until the government approved the contractor's performance schedule. The schedule was not approved, or even submitted, but the government failed to withhold the retainage as required by the contract. *Id.* at 1543–44. The surety filed a claim for the retainage, although it had not provided the government with notice of the contractor's default. The court in *National Surety* held that:

> In contrast [with *Fireman's Fund*] Dugdale's [the contractor's] bonded contract gave no discretion to the government to depart from the requirement of the ten percent retainage until after the complete project arrow diagram was submitted and approved. That condition was never met. When the contractor [in *Fireman's Fund*] abandoned performance before completion, as did Dugdale, and the government had knowledge of the default, as here, and so informed the surety, as here, *Fireman's Fund* does not impose a further requirement that the surety notify the government that "the principal has defaulted." The holding in *Fireman's Fund* did not change the rules of subrogation, but simply

dealt with the rights and obligations of the parties on the conditions of that case. *Id.* at 1547 (footnote omitted). Thus, the court in *National Surety* found that the notification requirement did not apply when the contract required withholding of retainage. *See also Hartford Fire Ins. Co. v. United States,* 40 Fed.Cl. at 524 n. 2. In sum, in *National Surety,* the language of the contract was found to be dispositive, and in *Fireman's Fund,* the court suggested that "[o]nly the contract should limit the government's flexibility," *Fireman's Fund Ins. Co. v. United States,* 909 F.2d at 499.[5]

In *Transamerica Premier Ins. Co. v. United States,* 32 Fed.Cl. 308, 311 (1994), which involved a contract modification analogous to the one present in the instant case, the mailing address for remaining contract payments was changed from the contractor's address to the surety's address in a modification to the contract. In *Transamerica Premier,* the surety wrote to the government, indicating that it had received notice of unpaid claims from subcontractors and suppliers, and asserting a right to the remaining contract funds in order to secure the funds for the subcontractors and suppliers. *Id.* at 310. "At the behest of plaintiff [the surety] and with CDC's [the contractor's] acquiescence, the Department issued a unilateral contract modification, 'P00007', ... changing the mailing address for the remaining contract payments from CDC's office to that of the plaintiff." *Id.* at 311. In *Transamerica Premier,* the government sent an initial check to the surety according to Contract Modification P00007. After completion of the contract, the surety sent a second letter to the contracting officer indicating it had received additional unpaid claims from subcontractors and suppliers, and again asserting a right to the remaining contract proceeds. The contracting officer responded that the final contract payment would be sent to the surety

**5.** *See also D & H Distributing Co. v. United States,* 102 F.3d 542, 546–48 (Fed.Cir.1996) (a contract modification providing for a subcontractor/creditor under the contract to be a joint payee with the government contractor was enforced under either a third party beneficiary theory or a theory of assignment of contract rights assented to by the government, with the court stating: "the contracting officer clearly assented to the transfer of rights under the contract to D & H, because the contracting officer expressly adopted the new payment arrangement as part of the contract.") and *Norwest Bank Arizona, N.A. v. United States,* 37 Fed.Cl. 605, 610 (1997) (a contract modification providing for a subcontractor's bank to be the payee was enforceable, with the court stating: "[t]he contract modification obligated the Government to pay the Bank.")

pursuant to Modification P00007. However, the check was sent to the contractor. *Id.* Under these facts, the court in *Transamerica Premier* found that the government was liable to the surety for the amount of the check sent to contractor rather than to the surety:

> Together with the first letter and the contract modification, this second letter afforded adequate notice and warning to the Government and created a stakeholder duty in the Government with respect to the retained funds. The Government's sole duty at this point was to ensure the proper disbursal of the final check. Indeed, P00007 was the administrative acknowledgement of the Government's duty as a stakeholder of final contract funds. A failure to comply with P00007 is tantamount to a breach of this duty. Having failed to follow its own contract modification, and instead erroneously sending the final contract payment to CDC, the Government breached this duty.

*Id.* at 316.

Unlike the facts in *Transamerica Premier*, in the case at bar, the surety did not identify to the Corps of Engineers deficiencies in payments due to subcontractors and suppliers on the contract. The complaint in the instant case, however, alleges that:

> 6.
>
> Between the months of January and July of 1993, the Department [of the Army] was notified of numerous claims from Met–Pro's subcontractors and suppliers on the Project alleging Met–Pro's failure to pay said subcontractors and suppliers for labor and materials supplied and used in the prosecution of Met–Pro's work on the Project. The Department, in turn, notified Met–Pro and its surety, IFIC, following the Department's receipt of each such notice.
>
> 7.
>
> On or about April 19, 1993, Contracting Officer's Representative Gordon Inman forwarded a letter to Met–Pro, with a copy to IFIC, which threatened issuance of "an interim unsatisfactory evaluation" of Met–Pro's performance under the Contract, be-

cause, *inter alia,* "[s]uppliers have advised me that they have not received payment in a timely manner."

The defendant notes that the complaint indicates:

> The June 16, 1993, letter to the Government was from Met–Pro, not IFIC. Moreover, the subject of the letter was a request for a change in the payee for contract disbursements, not a warning of contractor default. Thus, Met–Pro's June 16, 1993, letter certainly does not constitute a notice or warning from IFIC about contractor performance.

(emphasis in original) (citations omitted).

The complaint acknowledges that the June 16, 1998 letter, which was from the contractor, and not from the surety, did not discuss Met–Pro's performance difficulties. The complaint alleges, however, that IFIC was the voice behind the letter, that IFIC had requested that Met–Pro send the letter to the Corps of Engineers:

> 9.
>
> As requested by IFIC, on or about June 16, 1993, Met–Pro's President, R.B. Ethridge, sent a letter by registered mail to Contracting Officer's Representative Inman requesting that all future payments under the Contract b[e] made payable jointly to Met–Pro and its surety, IFIC.
>
> 10.
>
> On or about July 6, 1993, under the authority of F.A.R. § 43.103(b), the Department issued unilateral Contract Modification No. P00003 requiring that all future contract payments be made payable jointly to Met–Pro and its surety, IFIC. . . .

As indicated above, the complaint alleges that the notice provided by Met–Pro was at the instigation of IFIC. Defendant challenges the contents of the "notice," however, which did not reference contractor difficulties, but merely requested that remaining payments under the contract be made payable jointly to Met–Pro and IFIC. Moreover, although according to the complaint, the Corps of Engineers was on notice of

Met–Pro's performance difficulties, including the failure to make timely payments to subcontractors and suppliers on the contract, the government relies on language in the United States Court of Appeals for the Federal Circuit's decision in *Fireman's Fund,* "[t]hat some subcontractors and suppliers had informed the government of Westech's [the contractor's] payment deficiencies prior to the release of the retainage does not substitute for notice by the surety and does not trigger the government's equitable duty to act with reasoned discretion toward it." *Fireman's Fund Ins. Co. v. United States,* 909 F.2d at 499.

In *Fireman's Fund,* however, the surety did not ask the government for payments to be withheld from the contractor until almost five months after the government had released the funds that the surety was claiming. *Id.* The surety in *Fireman's Fund* unsuccessfully argued that the government should have refused to release funds to the contractor based, not on a request to withhold the remaining funds, but on the government's own knowledge of unpaid subcontractors and suppliers. In the instant case, in addition to the government's admitted knowledge of unpaid subcontractors and suppliers, the surety caused the contractor to request joint payments to the surety and the contractor, and the government in response modified the contract to effect the joint payment arrangement. The government did not advise Met–Pro or IFIC that the letter from the former was insufficient notice to establish a stakeholder duty, instead, the government acted on the notice and contractually acknowledged a stakeholder's duty with the unilateral execution of Contract Modification P00003. Logically and equitably, IFIC should not have been required to take further action, given the contractual reflection of the government's stakeholder's duty. The court, therefore, concludes that the complaint states a claim upon which relief can be granted. For the reasons described above, the court concludes that it possesses subject matter jurisdiction over the plaintiff's claims against the government and that the complaint has stated a claim upon which relief can be granted.

The plaintiff also filed a motion for summary judgment together with its response to defendant's motion to dismiss, contending that the government's breach of duty as a stakeholder of contract funds renders the government liable to IFIC as a matter of law. Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed. R.Civ.P.) and is similar in language and effect.[6] Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

RCFC 56(c) provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of demonstrating that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Creppel v. United States,* 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.,* 974 F.2d 1304, 1306 (Fed.Cir.1992); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. 674, 679 (1990), *aff'd,* 944 F.2d 885 (Fed.Cir.1991); *Rust Communications Group, Inc. v. United States,* 20 Cl.Ct. 392, 394 (1990). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment, however, will not be granted if "the dispute

---

**6.** In general, the rules of this court are patterned on the Federal Rules of Civil Procedure. Therefore, precedent under the Federal Rules of Civil Procedure is relevant to interpreting the rules of this court, including RCFC 56. *See Jay v. Secretary DHHS,* 998 F.2d 979, 982 (Fed.Cir.1993); *Imperial Van Lines Int'l, Inc. v. United States,* 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States,* 17 Cl.Ct. 67, 70 (1989).

about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury [trier of fact] could return a verdict for the nonmoving party." *Id.; see also Uniq Computer Corp. v. United States,* 20 Cl.Ct. 222, 228–29 (1990).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Cloutier v. United States,* 19 Cl.Ct. 326, 328 (1990), *aff'd,* 937 F.2d 622 (Fed.Cir.1991). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. 2505. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Stated otherwise, if the nonmoving party cannot present evidence to support its case under any scenario, then there should be no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs, *id.; see also Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985); *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The initial burden on the party moving for summary judgment, to produce evidence showing the absence of a genuine issue of material fact, may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmov-

ing party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Lima Surgical Assocs.,* 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence which establishes the existence of an element of its case upon which it bears the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548; *Lima Surgical Assocs.,* 20 Cl.Ct. at 679.

■ In the above-captioned case, the parties have agreed to the material facts and have filed joint stipulations of fact. No issues have been identified by the parties or the court which raise material issues of disputed fact. The court concludes that the case is ripe for consideration of the plaintiff's motion for summary judgment inasmuch as there are no material facts in dispute. Specifically, the parties have stipulated: (1) to the Corps of Engineers' awareness of Met–Pro's unpaid subcontractors and suppliers and related failure to make satisfactory progress on the contract; (2) that Met–Pro's letter to the Corps of Engineers to render joint payments under the contract, to Met–Pro and IFIC, was requested by IFIC; (3) that, as a result of the surety-induced request, the Corps of Engineers modified the contract to provide for Met–Pro and IFIC as joint payees of remaining funds under the contract; (4) that, subsequent to the contract modification providing for joint payees, the Corps of Engineers paid $67,054.52 solely to Met–Pro rather than jointly to Met–Pro and IFIC; and (5) that, as surety under the contract, the plaintiff made payments in excess of $67,054.52 to subcontractors and suppliers for labor and materials furnished under the contract pursuant to the payment bond. The court concludes that a stakeholder's duty in the government arises under these agreed upon facts.

■ Defendant next argues that even if the court were to find a stakeholder's duty to exercise due care with remaining contract funds, during contract performance, the government's principal interest is in the efficient completion of the contract such that government officials are given broad discretion in

contract administration and in disbursing contract funds, as follows:

> The payment to Met–Pro occurred on July 19, 1993—one month prior to the August 17, 1993, contract completion date. Thus, in this case, where the Government paid Met–Pro prior to the completion of the contract, the Government's concern for efficient contract completion was paramount.... [B]y issuing the July 19, 1993, payment to Met–Pro—prior to the completion of the contract, the Government's actions, while possibly inconsistent with P000[0]3, were still well within the reasonable discretion of the contracting officer.

(emphasis in original). The United States Court of Appeals for the Federal Circuit in *Balboa Ins. Co. v. United States,* 775 F.2d 1158 (Fed.Cir.1985), identified eight factors which have been considered by the United States Court of Claims and by other courts as important in the determination of whether the government has exercised reasonable discretion in disbursing contract funds:

(1) Attempts by the Government after notification by the surety, to determine that the contractor had the capacity and intent to complete the job.

(2) Percentage of contract performance completed at the time of notification by the surety.

(3) Efforts of the Government to determine the progress made on the contract after notice by the surety.

(4) Whether the contract was subsequently completed by the contractor (not conclusive, but relevant to show the reasonableness of the contracting officer's determination of the progress on the project).

(5) Whether the payments to the contractor subsequently reached the subcontractors and materialmen (this goes to the equitable obligation of the Government to subcontractors and others to see that they will be paid; also, because the surety is liable to the subcontractors, any money that reaches them furthers the objectives of the surety as well as those of the Government).

(6) Whether the Government contracting agency had notice of problems with the contractor's performance previous to the surety's notification of default to the Government.

(7) Whether the Government's action violates one of its own statutes or regulations.

(8) Evidence that the contract could or could not be completed as quickly or cheaply by a successor contractor.

*Id.* at 1164–65 (citations omitted). In evaluating the Corps of Engineers' exercise of discretion, the fifth and sixth *Balboa* factors appear to be particularly relevant to the instant case.

■ Defendant, however, argues that the contracting officer did not have to exercise reasonable discretion and should not be measured by the factors listed in *Balboa,* in that the issue was not reached:

> In accordance with *Balboa,* the CO did not have to determine that the contractor had the capacity and intent to complete the job because IFIC failed to notify the CO of Met–Pro's potential default. Secondly, the[re] was no need to determine what percentage of the contract performance was completed at the time of *notification* because IFIC, again, filed to provide any notice to the CO.

As noted above, however, in the instant case this court has not found the assigned defects in the surety's notification to the Corps of Engineers to be fatal under the facts presented. Similarly, the court in *Transamerica Premier* observed:

> We note in passing that, while defendant asserts the applicability of the *Balboa* decision, its brief fails to explain how that is so. The argument that is offered does not explain why the Government's need for leeway in the management of contract funds during performance—this being the essential thrust of the *Balboa* decision— can or should absolve the Government from its responsibility to direct funds to the addressees named in a properly executed contract modification.

*Transamerica Premier Ins. Co. v. United States,* 32 Fed.Cl. 308, 315 n. 6 (1994).

Defendant also attempts to justify an alternative proposition, that a contracting officer has discretion to violate joint payment provisions in the contract ("the Government's actions, while possibly inconsistent with P00003, were still well within the reasonable discretion of the contracting officer"), with the government's payment procedures. Defendant states in its brief:

Because this contract had military funding, payments were being made by the Waterways Experiment Station ("Waterways") rather than Vicksburg District's usual civil works payment office in Memphis, Tennessee. A payment request from the contractor would be delivered to COR [Contracting Officer's Representative] Inman, to the Construction Division in the District, to Waterways for payment. By contrast, the request for change in payee went from Met–Pro, to COR Inman, to the Contracting Division, to Memphis, back to the Contracting Division, and then to Waterways. By the time the modification changing the payee was returned to Waterways, payment request no. 7 had been paid in the amount of $67,054.52.

Defendant's explanation does not suggest a reasoned exercise of discretion, but labyrinthine government process and procedure at work. Moreover, in spite of the asserted procedural difficulties in the payment process, the actual payment approval form used by the Corps of Engineers to authorize the $67,054.52 for payment contains a reference to Modification P00003, to the joint payees, and to the proper check-mailing address from Modification P00003. Only the subsequent government check was incorrectly addressed. The correctly completed payment form suggests simple error in the incorrectly completed check rather than a reasoned exercise of discretion culminating in a reasonable decision not to comply with Contract Modification P00003.

Despite the defendant's argument that the government was exercising its discretion, the court notes that the Corps of Engineers had no governmental interest itself in the remaining funds, and had executed a contract modification providing for joint payees; that

the contractor's interest was reflected in its request that the surety be a joint payee; and that the surety's interest was reflected in its request for the joint payee procedure in order to protect amounts owed subcontractors and suppliers. Under the facts and circumstances of this case, the Corps of Engineers should have provided a check jointly to Met–Pro and IFIC, and such action was required by the contract. In reality, far from being a reasoned exercise in judgment and discretion, defendant's own recital of why the contract's payment provisions were violated appears to be one of inefficient payment procedures at best resulting in error when cutting the final check. In the government's explanations, there is no reflection of a reasoned exercise of judgment and discretion on the part of the Corps of Engineers. As the United States Court of Appeals for the Federal Circuit court observed in *Balboa,* "[w]ith respect to the surety ... this discretion and flexibility is limited by [the government's] 'duty to exercise its discretion responsibly and to consider the surety's interest in conjunction with other problems encountered in the administration of the contract.'" *Balboa Ins. Co. v. United States,* 775 F.2d at 1164 (citing *Argonaut Ins. Co. v. United States,* 434 F.2d 1362, 1368, 193 Ct. Cl. 483 (1970)). The court finds that defendant, in violating the joint payee provisions of the contract, breached its stakeholder's duty to exercise due care in the disposition of remaining funds on the contract in question.

### CONCLUSION

For the foregoing reasons, defendant's motion to dismiss is **DENIED,** and the plaintiff's motion for summary judgment is **GRANTED.** The Clerk of the Court shall enter judgment in plaintiff's favor in the amount of $67,054.52.[7]

**IT IS SO ORDERED.**

---

7. The plaintiff's complaint asks for a monetary

judgment in the amount of $67,054.52, "together

with interest as may be allowed by law, and for any and all further relief deemed just and appropriate by this Court." Pursuant to 28 U.S.C. § 2516(a) (1994), interest on a claim against the United States shall be allowed only under a contract or federal statute which expressly provides for such interest. The plaintiff has not brought any potential contractual or statutory authorization to the court's attention.